EL PUEBLO DE PUERTO RICO, apelado, *v.* ERICK CRUZ GRANADOS y LUIS CAMACHO ORTIZ, acusados y apelantes.

*Número:* CR-83-57    *Resuelto:* 18 de diciembre de 1984

*Héctor Lugo Bougal,* abogado de los apelantes; *Roberto Schmidt Monge, Procurador General, Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

SENTENCIA

Por existir duda razonable sobre la culpabilidad de los acusados se revoca la sentencia apelada dictada por el Tribunal Superior, Sala de Ponce.

Así lo pronunció el Tribunal y certifica la señora Secretaria General. El Juez Asociado Señor Negrón García emitió opinión separada a la cual se une el Juez Asociado Señor Irizarry Yunqué. El Juez Asociado Señor Torres Rigual no intervino. El Juez Asociado Señor Rebollo López se inhibió.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Opinión del Juez Asociado Señor Negrón García a la cual se une el Juez Asociado Señor Irizarry Yunqué.

Decidimos esta apelación evocando que "[h]asta tanto se

disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila". *Pueblo* v. *Carrasquillo Carrasquillo*, 102 D.P.R. 545, 551–552 (1974). En esta misión es regla auxiliadora "el análisis de perspectiva integral de la prueba, atribuyéndole mayor valor probatorio a la evidencia aportada que contiene la característica de garantía circunstancial de veracidad entre las cuales se destaca la que posee ingredientes de espontaneidad y contemporaneidad con el suceso. Las muchas dudas que surgen con respecto a la credibilidad que merece un testigo o a la posibilidad de que su relato sea lo más cercano y probable a la realidad extrajudicial ya pasada, son susceptibles de ser salvadas y esclarecidas mediante este enfoque". *García* v. *A.F.F.*, 103 D.P.R. 356, 358 (1975).

El proceso investigativo tendente a esclarecer e identificar exitosamente al autor de un crimen no es tarea fácil. Intervienen numerosos factores entre los cuales se destaca la disponibilidad de testigos oculares. Sobre éstos, el criterio cualitativo testimonial, a saber, la habilidad del deponente para *percibir* el acontecimiento, aptitud para *conservarlo* en su memoria, capacidad para *evocarlo*, modo de *querer* expresarlo, y cómo puede hacerlo, es esencial. El elemento tiempo resulta importante y, de ordinario, afecta estos factores. "Ingredientes adicionales tales como el grado de inteligencia del testigo, su facilidad o dificultad para verbalizar y explicar, el nerviosismo natural que genera la sala de un tribunal, las expectativas de una confrontación de lo atestado con el contrainterrogatorio, el interés en el desenlace final del caso y un sinnúmero de imponderables, imponen sobre los tribunales de instancia la más delicada función del quehacer judicial humano: el descubrir la verdad haciendo el mayor esfuerzo en dirimir prueba conflictiva y en muchas ocasiones incompleta." *García* v. *A.F.F.*, 103 D.P.R. 356, 357–358. Este proceso mental y realidad forense —que corresponde más bien a la disciplina de la psicología del testimonio— nunca puede ser ignorado por un tribunal. Su comprensión y apli-

cabilidad será en última instancia el elemento que inclinará de uno u otro lado la balanza de la justicia. *Pueblo* v. *Morales Rivera*, 112 D.P.R. 463, 464 (1982).

## I

En la noche del 9 de mayo de 1979 fue incendiada una estructura que albergaba en su segundo piso el Comité Municipal del Partido Nuevo Progresista (P.N.P.) en la calle Comercio esquina Mayor de Ponce.

Erick Cruz Granados y Luis Camacho Ortiz fueron acusados conjuntamente con José A. Rodríguez Ortiz c/p "Petróleo"[1] de incendio agravado. La causa se ventiló ante tribunal de derecho (Hon. Víctor Vargas Negrón, J.).

El Ministerio Fiscal desfiló y sometió prueba circunstancial tendente a establecer que el incendio se debió al acto criminal de los acusados.

A tal efecto, se estipuló la declaración del químico de la Policía José H. Santiago Rentas. Aunque la minuta consigna que éste "analizó un galón plástico y pedazo de botella de cristal con una mecha detectando [*sic*] residuo de gasolina en *ella*" (*Exhibit* 3), según su propio informe suscrito el 2 de julio de 1979 (*Exhibit* 4 de El Pueblo), el resultado de la prueba de laboratorio para determinar la presencia de acelerante o incendiarios *sólo fue positivo* en cuanto al galón plástico que contenía un líquido rojizo en su interior. Dicho líquido era "un derivado de petróleo conocido como gasolina". Este dictamen pericial quedó confirmado posteriormente por el informe de 23 de abril de 1980 del químico de laboratorio Julio Román Muñoz (*Exhibit* 6 de El Pueblo). En su análisis también detectó gasolina en ese envase plástico. Sin embargo, señaló que *no* había acelerantes o sustancia inflamable en "el cuello de una botella de Pepsi-Cola con residuos quemados en su interior y fragmento de vidrio claro correspondiente a parte

---

[1] Este apodo tan sugestivo cobra vida propia en el trasfondo fáctico en que se debate la causa.

de la misma y residuo de materia quemada". Tampoco los había en una "caneca de vidrio transparente" y en "envase color ambar, capacidad de 1 galón".

Además se estipularon los testimonios de Walter Valenzuela, agente de la Unidad de Incendios y Explosivos que ocupó el galón plástico y la botella de cristal y del entonces alcalde José G. Tormos Vega, Presidente del P.N.P. en Ponce, respecto a que no consintió ni permitió que ninguna persona le pegara fuego a la estructura.

En adición a estas estipulaciones y los objetos e informes antes mencionados, se admitieron un sinnúmero de fotografías. Subsiguientemente prestaron testimonio Franquie Pérez Ginorio, Pedro D. Castilloveitía y Wigberto Bolier.

Pérez Ginorio, investigador del Negociado de Investigaciones Especiales (NIE), atestó que según su examen pericial el incendio no se debió a un corto circuito eléctrico u otra causa natural, sino que fue causado intencionalmente.

Pedro Castilloveitía, estudiante, declaró que residía junto a su abuela frente al referido comité. Estaba estudiando cuando "a eso de las *11:30 a 12:00* de la medianoche" oyó el ruido de un carro detenerse un momento, romperse una botella de cristal, y al acercarse y mirar por la ventana, se percató del siniestro al tiempo que el vehículo abandonaba el lugar a toda velocidad. Llamó a los bomberos. "Cuando salió al balcón, vió el fuego *que estaba en todo el techo de la estructura.*"

El testigo principal fue Wigberto Bolier, a la sazón guardián de seguridad del cercano Condominio La Ceiba. Para el día de los hechos su horario era de 11:00 P.M. a 7:00 A.M. Relató que vio "una cosa tan grande como un fuego". La curiosidad le movió a subirse sobre unos bancos de una cancha detrás del condominio para observar mejor. Inmediatamente vio las luces de un vehículo. Bajó para abrir el portón. En un carro gris de dos puertas identificó a José A. Rodríguez c/p "Petróleo", y a los apelantes Erick Cruz Granados c/p "El Flaco" y a Luis Camacho Ortiz c/p "El Pelú". Los conocía con

anterioridad. El vehículo pertenecía y era conducido por Cruz Granados. Éste lo estacionó y salió con los otros del vehículo. Transcurrido algún tiempo, "Petróleo" le echó los brazos y le dijo "Bolier *yo* quemé el comité del P.N.P.". Profirió palabras obscenas y estaba molesto con el alcalde Tormos Vega. Cruz Granados lo recriminó y advirtió que si seguía hablando podía ser delatado a la Policía. No obstante ese aviso de cautela, dijo además que vio a Cruz Granados sacar ante él una botella de "Coca Cola" llena de gasolina con una mecha del baúl del auto. "Petróleo" la lanzó a un pastizal anejo. El incidente duró aproximadamente diez (10) minutos.

Bolier finalmente declaró que los tres individuos olían a gasolina. Que "Petróleo" le manifestó que entre él y "El Pelú" "fueron los que le pegaron fuego al comité". "El Flaco" "estaba en el parking velando". Cuando ocurrieron estas manifestaciones los apelantes Cruz Granados y Camacho Ortiz se encontraban como a siete (7) pies de distancia.

Durante el contrainterrogatorio, Bolier indicó que el incidente relatado ocurrió como "a eso de las *4:30*". No comunicó los hechos a la Policía al día siguiente, aun cuando en el condominio residían varios agentes de la Policía. Tampoco los informó a su madre, con quien vivía, ni a ninguna otra persona. Estuvo ajeno a la noticia difundida radialmente que como autor intelectual del incendio señalaba al Alcalde Tormos Vega. Según Bolier, "ellos vinieron a mí" refiriéndose al Departamento de Justicia. Aclaró que un agente de apellido Mercado le visitó para inquirirle sobre los hechos. Al momento de prestar declaración jurada a petición del Departamento de Justicia, Bolier estaba desempleado. Habían transcurrido cinco (5) meses del incendio. Admitió que le era leída la declaración jurada con frecuencia por un oficial de apellido Vargas con el propósito de refrescarle la memoria.

La defensa presentó prueba para controvertir la veracidad del testimonio de Bolier y la legitimidad de la teoría del Ministerio Fiscal.

Jaime Negrón Castro, cabo de la Policía Municipal de Ponce, atestó que prestó declaración jurada escrita el 6 de septiembre de 1979. En la misma manifestó que "[e]l día siguiente al incendio me llamó el Sr. Eddie Zavala, secretario municipal de Ponce y me informó que el Club del P.N.P. 'lo habíamos mandado a quemar nosotros' ", y que "los que cometieron el incendio fueron el ex-policía municipal José A. Rodríguez conocido por Petróleo y el ex-agente del N.I.C. Jorge González . . . era para distraer la atención pública sobre el caso del Cerro Maravilla".

Que luego de prestar dicha declaración fue citado por los fiscales Pedro Colton y Figueroa Vivas en San Juan y allí alegadamente fue reprendido, insultado y coaccionado para que cambiara su declaración, si no "le iban a quitar el uniforme".

Los apelantes Cruz Granados y Camacho Ortiz negaron toda relación con el incendio. Relataron algunos supuestos incidentes de coacción e intimidación por parte de los fiscales Pedro Colton y Ángel Figueroa Vivas durante el proceso de investigación. En igual forma adujo haber sido tratado el testigo Sigfrido Arriaga, joven estudiante dominicano. Dijo que durante una investigación relacionada con una alegada conversación en el Condominio La Ceiba fue amenazado de ser deportado. Negó toda participación.

Además, presentaron declaraciones juradas de Jaime Negrón Castro y Sigfrido Arriaga Félix ante el fiscal. Por último sometieron una declaración jurada presentada por José A. Rodríguez Ortiz c/p "Petróleo", en presencia del cabo municipal Héctor O. Irigoyen, ante el notario Samuel Ramírez Torres el 21 de septiembre de 1979. Luego de ser advertido de las consecuencias legales, en la misma éste relató que "Georgi" "que es como si fuera hermano mío", le dijo que había que quemar el comité. Estudiaron el "ambiente" tres días antes. Entrarían temprano al local, se quedarían allí, regarían la gasolina, lanzarían un fósforo y escaparían por la parte de atrás. Hubo un primer intento fallido debido a la presencia

en las inmediaciones del local de dos guardias municipales. Días después "Georgi" recibió una llave del comité para facilitar la entrada. El día señalado, entraron a las 6:30 P.M. y se acostaron a dormir. La gasolina estaba en cuatro (4) galones plásticos. Cuando llegó la hora "como a las doce de la noche" regaron con gasolina el interior. "[C]uando se nos vaciaba un galón cuando estábamos regando gasolina lo [sic] íbamos regando por otra parte cosa para que cuando cogiera fuego los galones se quemaran." "Georgi tiró el fósforo." Luego huyeron corriendo. Rodríguez se marchó à su casa, se dio un baño y se puso a "hablar con el Wacheman [sic] allí. Ya yo se lo había dicho a Irigoyen [cabo de la guardia municipal]". A preguntas de quién dio la orden de quemar el comité, señaló que "[s]olamente lo saben estas personas, Eddie Zavala, el Alcalde José Tormos Vega, la esposa del Alcalde Irdín Chardón, Georgi, yo y Lamoutte".

A Rodríguez se le permitió hacer alegación de culpabilidad por el delito menor (incendio). El 15 de diciembre de 1981 fue sentenciado a cumplir de cinco (5) a siete (7) años de presidio, bajo el régimen de sentencia suspendida. Fue representado por el Lic. Samuel Ramírez Torres.

El caso quedó sometido el 13 de noviembre de 1981. El tribunal de instancia, varios meses después —el 14 de abril de 1982— emitió una resolución escrita en la cual, luego de resumir la prueba, los declaró culpables. Impúsoles una pena de tres (3) a cinco (5) años de presidio bajo el régimen de sentencia suspendida, en atención a la que le fue impuesta a José A. Rodríguez c/p "Petróleo". Expuso el siguiente razonamiento:

> El caso de *Serrano Nieves* [93 D.P.R. 56 (1966)] nos recuerda la tarea que no acaba, la apreciación de la prueba, para cuyo descargo todavía no se ha inventado la computadora salvadora.
>
> Contrario al caso de Serrano, el testimonio de Bolier no es improbable, ni increíble. Admitimos que no se trata de un testigo glamoroso, sino de una persona de muy escasa ins-

trucción; que no sabe leer ni escribir, pero precisamente son esas cualidades las que lo rescatan de incurrir en falsedades, y que ante la figura imponente del abogado defensor, supo defender con hidalguía tal vez su único atractivo, su respeto a la verdad. Cuando Bolier dice que vió una cosa grande, como un fuego, cuando dice además, que estuvieron allí hablando como diez horas, expresión que arrancó un comentario del abogado, cuando se asombra de que alquien pueda creer que un alcalde va a mandar a pegar fuego, todo ello es indicio de una ingenuidad tal, que excluye cualquier posibilidad de artificio.

Frustrada la maniobra de desacreditar la credibilidad del testigo, la defensa encaminó sus esfuerzos a demostrar una conspiración de las autoridades para implicar a los co-acusados en el fuego del local que ocupaba el partido de gobierno en Ponce, pero dichos esfuerzos nunca levantaron vuelo.

Los jueces de instancia y los jurados normalmente están en mejores condiciones de aquilatar la prueba oral. Tienen la ventaja de ver y escuchar directamente a los testigos. Sus determinaciones merecen gran respeto. *Pueblo* v. *Nevárez Virella*, 101 D.P.R. 11 (1973). De ordinario la credibilidad y el dictamen de un caso sólo será alterado ante parcialidad o error manifiesto en la evaluación de la evidencia. *Pueblo* v. *López Ramos*, 96 D.P.R. 699, 703 (1968); *Pueblo* v. *Iturrino De Jesús*, 90 D.P.R. 706, 712 (1964); *Pueblo* v. *Aponte González*, 83 D.P.R. 511, 520 (1961). Esta regla sufre excepción en prueba documental y tangible. Sobre la misma estamos en igual posición que los foros primarios para apreciar su valor probatorio.

## II

Hecha esta aclaración, evaluemos el primer error planteado sobre la suficiencia de la prueba.

A los fines de una adecuada adjudicación es menester unos breves comentarios sobre las leyes físicas y químicas elementales en juego, susceptibles de conocimiento judicial cuando investigamos las causas y razones de un incendio. Las auto-

ridades son abundantes. Después de todo la conducta humana en fuegos accidentales por imprudencia o negligencia, o en los que interviene una mano criminal, tiende a repetirse. Con buen juicio se ha dicho que las leyes del hombre pueden ser quebrantadas pero no las de la naturaleza y física. Siempre éstas nos dejarán válidos indicadores o huellas para acercarnos y descubrir el ideal de la verdad. "La realidad previamente expuesta cobra mayor importancia tratándose de casos de incendio, como el que nos ocupa, en que por la naturaleza del elemento envuelto, la génesis del suceso regularmente resulta difícil de determinar, perpetuar y producir subsiguientemente ante los tribunales." *García* v. *A.F.F.*, supra, pág. 358.

Todo fuego sigue unas leyes físicas y químicas comúnmente reconocidas. Para que un fuego se inicie es menester que concurran tres condiciones: temperatura (calor suficiente), combustible o material inflamable y oxígeno u otro agente oxigenante. J. Kennedy, *Fire and Arson Investigation*, Chicago, Investigations Institute, 1962, pág. 223; Tedeschi-Eckert-Tedeschi, *Forensic Medicine*, Philadelphia, W. B. Saunders Co., 1977, Vol. I, pág. 735. Una buena labor investigativa conlleva examinar metódicamente los escombros para localizar pistas y preservar evidencia. Los daños deben ser interpretados a la luz de estos fenómenos de la naturaleza para arribar a unas conclusiones racionales sobre su origen. Son indicadores claves —coetáneos o posteriores— el color del humo, la presencia o no de vapor, el color de la flama, el tamaño del incendio, la dirección en que viaja, la localización de las flamas y los olores detectables. C. E. O'Hara, *Fundamentals of Criminal Investigation*, 7ma ed., Illinois, Ed. C. C. Thomas, 1967, págs. 201–203; G. D. Bennett, *The Arson Investigator and Technical Aids*, 49 J. Crim. L. Criminology & Police Sci. 172–177 (1958).

La prueba del Ministerio Fiscal está huérfana sobre muchos de esos datos. No se presentó evidencia en torno a la inter-

vención del Servicio de Bomberos. El informe oficial de dicho cuerpo —fácilmente accesible— contentivo del tiempo que duró, posibles orígenes, magnitud y otras valiosas observaciones, lamentablemente quedó fuera del recinto judicial. Por ende, forzosamente habremos de referirnos a aquellos limitados detalles que surgen de la evidencia total.

Se acepta que una propagación rápida de un incendio "es indicativa del uso de acelerantes o algún otro método de preparación física". (Traducción nuestra.) O'Hara, *op. cit.*, pág. 202. De importancia es la trayectoria en que viaja. Todo fuego, por razón de leyes físicas, tiende a elevarse hasta que al toparse con obstáculos se proyecta horizontalmente para buscar otra vez vías verticales. "La extensión y velocidad de desplazamiento en dirección horizontal dependerá primordialmente de la dirección del viento y de las condiciones de ventilación tales como puertas y ventanas abiertas. El que un fuego se propague en una dirección poco común o a una velocidad excepcional debe levantar sospechas sobre la presencia de acelerantes o de una preparación previa en cuanto a las puertas y ventanas." (Traducción nuestra.) íd., pág. 203.

La gasolina es uno de los acelerantes más usados por incendiarios. Existe la errónea impresión de que no puede ser localizada, aislada e identificada. Nada más lejos de la verdad. Tedeschi-Eckert-Tedeschi, *op. cit.*, pág. 736. La experiencia y las pruebas de laboratorio revelan lo contrario. Nat. Inst., *Arson and Arson Investigation*, Law Enforcement and Criminal Justice 77 (oct. 1977). En la investigación forense, desde la década de 1960 existen exámenes de laboratorio eficientes para descubrir trazas de hidrocarburo derivado de petróleo. Hay distintos métodos. El más generalizado y efectivo es el de la técnica de "cromatografía gaseosa" (*gas chromatography*). Stone-Lomonte-Fletcher & Lowry, *Accelerant Detection in Fire Residues*, 23 J. Forensic Sci. 78–83 (1978); Armstrong & Wittkower, *Identification of Accelerants in Fire Residues by Capillary Column Gas Chromatography*, J.

Forensic Sci., *op. cit.*, págs. 662–671; Chissum & Elzerman, *Identification of Arson Accelerants by Gas Chromatografic Patterns Produced by a Digital Log Electrometer*, 17 J. Forensic Sci. 280–291 (1972); D. Q. Burd, *Detection of Traces of Combustible Fluids in Arson Cases*, 51 J. Crim. L. Criminology & Police Sci. 263–264 (1960); D. L. Adams, *The Extraction and Identification of Small Amounts of Accelerants from Arson Evidence*, 47 J. Crim. L. Criminology & Police Sci. 593–596 (1957); J. W. Brackett, Jr., *Separation of Flammable Material of Petroleum Origin from Evidence Submitted in Cases Involving Fires and Suspected Arson*, 46 J. Crim. L. Criminology & Police Sci. 554–561 (1956).

"Expuesta en términos sencillos, cromatografía gaseosa representa el método mediante el cual una mezcla de moléculas son rápidamente separadas y examinadas usando un gas como el agente transportador." (Traducción nuestra.) F. Lundquist, *Methods of Forensic Science*, New York, Interscience Pub., 1963, Vol. II, pág. 129. Como la técnica de separación conlleva a veces diferentes colores, se le denomina "cromatografía", término que literalmente significa "escritura a color". Smoot-Price-Smith, *Chemestry—A Modern Course*, Ohio, C. E. Merrill Pub. Co., 1983, págs. 287, 291–292; Lundquist, *op. cit.*, págs. 127–170.

En síntesis, la primera característica de importancia aplicable al caso de autos, es que el fuego siempre tiende a desarrollarse verticalmente en ausencia de alguna obstrucción.

Otros factores pertinentes son sus efectos sobre determinado material. Cabe aquí recordar que la estructura del comité era casi en su totalidad de madera. "El fuego que envuelve una viga de madera tiende a redondear las esquinas del lado más lejano de la fuente de la flama. La superficie de una madera carbonizada experimenta un patrón de grietas que en apariencia es similar a la piel de un cocodrilo. El punto probable de origen es aquel sitio donde están las marcas más pequeñas del 'patrón de cocodrilo' y se encuentran las más pro-

fundas. Así, un investigador al acercarse más al punto de origen, encontrará que la carbonización es más profunda y los segmentos de 'huellas de cocodrilo' se convierten en más pequeñas." (Traducción nuestra.) O'Hara, *op. cit.*, págs. 205–206; *Arson and Arson Investigation, op. cit.*, págs. 87–88.

Finalmente, en cuanto al uso de combustible acelerante, como la gasolina, también la forma en que se quema la madera es reveladora. "Si la madera, antes de quemarse, es empapada con un producto de petróleo, como gasolina o querosén, adquirirá una apariencia distinta al carbonizarse. El 'efecto de piel de cocodrilo' será más fácil de observar. Las marcas de carbonización serán más profundas donde el líquido haya penetrado la madera. Así, la carbonización seguirá el patrón del líquido derramado." (Traducción nuestra.) O'Hara, *op. cit.*, pág. 207.

### III

Con vista a estas observaciones preliminares sobre el fenómeno y dinámica de un incendio, el proceso integral racional y reflexivo de formar conciencia judicial ha sido arduo, complejo y pausado. Hemos leído y releído la Exposición Narrativa de la Prueba, las declaraciones juradas y los informes de laboratorio. Hemos examinado acuciosamente las fotografías. Estas últimas gozan de una garantía circunstancial especial de veracidad. La precisión y claridad con que presentan a la vista las imágenes recogidas por el lente de la cámara es más elocuente que muchos testimonios verbales. Salvo cuando responden a una composición alterada y ficticia son enteramente objetivas y confiables, particularmente en casos de incendios, pues son "capaces de perpetuar ciertos detalles de subsiguiente importancia los cuales nadie notó al momento de inspeccionar el lugar". (Traducción nuestra.) R. Leofic Jackson, *Criminal Investigation*, 5ta ed., Toronto, The Carswell Co. Ltd., 1962, pág. 144; Kennedy, *op. cit.*, págs. 257–272.

Los *Exhibits* fotográficos 7(a) al 7(k) y 9(a) al 9(g) recogen la escena del siniestro un día después de acaecido.

Siete fotografías correspondientes al *Exhibit* 9 fueron estipuladas como expositivas "del origen del fuego". Son muy iluminadoras.

De las mismas, en términos generales, surge que el interior del local fue totalmente consumido, excepto sus paredes de ladrillo. La sensación es que fue ingobernable. Aparecen escombros de innumerables maderas, vigas carbonizadas y otros objetos.(²) Igualmente vemos las planchas de zinc del techo. Además hay quemados objetos y equipo de archivo de oficina. Se observan, como sitios más afectados, el centro de la estructura hacia la parte posterior contraria a la calle Comercio. Todavía erectas, percibimos varias columnas de madera que sostenían el techo. Aparecen quemadas desde el nivel del piso hacia arriba.

En términos específicos, detectamos que el *Exhibit* 7(d) refleja entre otros escombros la parte superior de una botella de cristal rota. Apreciamos visualmente sin dificultad la palabra "Pepsi". La foto no nos permite —comparándola con otras y mediante la técnica del mosaico— establecer dónde exactamente y a qué distancia del balcón frontal fue encontrada. La prueba oral tampoco nos da la respuesta.

El *Exhibit* 7(k) es sumamente revelador. Reproduce el balcón colgante de madera en la segunda planta. Surge que fue muy poco afectado por el incendio. Se mantienen partes de sus paredes, piso, techo, columnas y barandas.

En el *Exhibit* 9 notamos el piso de madera en que el fuego penetró más profundamente y destruyó notablemente. Ello sugiere que ahí se originó. Advertimos que esos grandes agujeros visiblemente carbonizados en el piso se extienden —en forma de trillo o senda— hacia el área posterior de la estruc-

---

(²) Los siguientes factores pueden influenciar las condiciones de los escombros: temperatura; tiempo del incendio; uso de acelerantes; cambios en color en concreto y acero; grado de enfriamiento; método de extinción usado; condiciones atmosféricas; presencia de agentes oxidantes; y naturaleza de la estructura y su contenido. J. Kennedy, *Fire and Arson Investigation*, Chicago, Investigations Institute, 1962, pág. 243.

tura. (*Exhibit* 9 (b) (c) (d) y (e).) Razonablemente inferimos que marcó una ruta de escape a la par que sirvió de mecha.

En resumen, las fotografías apuntan poderosamente hacia las siguientes conclusiones: (1) que su origen, esto es, el punto inicial donde estuvo la chispa, braza o fósforo que lo causó, fue aproximadamente en el centro de la estructura; (2) que el fuego se desarrolló rápidamente hacia la parte posterior; (3) que fue de vastas proporciones, irreductible y sus llamas envolvieron toda la estructura excepto el frente; (4) que hay varios agujeros profundos en el sitio de origen donde la madera quedó calcinada, probablemente por efectos de una mayor acumulación o impregnación de la gasolina; y (5) que esa huella carbonizada es típica de una mecha que sigue como un pasadizo hacia atrás, esto es, en dirección opuesta al frente del local en la calle Comercio. Corrobora estas impresiones que el incendio no afectara sustancialmente el balcón de madera colgante del frente del comité.

De la evaluación integral de la prueba —cargo y defensa— *no* albergamos duda respecto a los siguientes hechos: (1) que el fuego, que comenzó aproximadamente a las 12:00 P.M., fue intencional; (2) que José Rodríguez "Petróleo" entró con mucha facilidad al local; (3) que estaba acompañado; (4) que usaron y regaron el piso de madera con gasolina envasada en uno o más galones plásticos; (5) que intentaron que ése o los envases desaparecieran al ser consumidos por las llamas; (6) que debido al uso extenso de la gasolina el incendio se propagó rápidamente y consumió —excepto el balcón colgante que da de frente a la calle Comercio— toda la estructura de madera, inclusive el techo; (7) que por la celeridad de su desarrollo y vastas proporciones se hizo prontamente visible a los sectores cercanos dentro de la ciudad de Ponce; (8) que los autores "inmediatamente huyeron por atrás y se marcharon de la escena del crimen"; (9) que "Petróleo" se fue a su apartamento en el Condominio La Ceiba; y (10) que allí le dijo a un guardián de seguridad, presumiblemente Bolier, que había quemado el comité.

En esta etapa hemos intentado reconstruir la comisión del crimen interpretando la prueba circunstancial de la forma más favorable al Ministerio Fiscal y en contra de los apelantes. En esta tarea habremos de suspender momentáneamente todo juicio crítico sobre las contradicciones existentes y lagunas inexplicables. El resultado sería el siguiente: "Petróleo" y Camacho Ortiz llegaron en el auto de Cruz Granados —conduciendo éste— cerca del comité; se detuvieron y bajaron; "Petróleo" y Camacho Ortiz penetraron por detrás, mientras Cruz Granados vigilaba afuera; una vez dentro, "Petróleo" y Camacho Ortiz regaron el piso de madera con gasolina, luego salieron; junto con Cruz Granados se dirigieron al frente del comité en la calle Comercio; allí se detuvieron y lanzaron sobre el techo el "cóctel Molotov" preparado en la botella de "Pepsi"; el artefacto de cristal rompió contra el techo de zinc, explotó y lo incendió todo; no sabemos cómo, pero algunas de las chispas inmediatamente vinieron en contacto con la gasolina en el piso de madera y entonces se extendió en su totalidad; que todos huyeron; que se tardaron un tiempo en llegar al Condominio La Ceiba; y que allí "Petróleo" admitió a Bolier haber pegado fuego junto a los apelantes.

Sin embargo, la dificultad de aceptar esta interpretación surge de que existen serias dudas fundadas en varias interrogantes, lagunas y aparentes contradicciones sobre detalles esenciales en la prueba del Ministerio Fiscal. Expongámoslas.

Se destaca primeramente la ausencia de móvil claro y definido. El único indicio que surge de la prueba de cargo es un aparente sentimiento de hostilidad de "Petróleo" contra el Alcalde Tormos Vega. Aunque no es determinante, en el trasfondo de personas envueltas, es revelador.

Se plantea de inmediato un conflicto irreconciliable en cuanto a la *secuencia temporal*. El testigo Castilloveitía sostiene que el incendio fue entre 11:30 P.M. y 12:00 P.M. El guardián Bolier alega que el incidente con "Petróleo" y los apelantes ocurrió como a las 4:30 A.M. Aún restándole media

o una hora para compensar un posible margen de error, la diferencia de más de tres (3) horas es inmensa. Confesamos que arroja dudas sobre la veracidad o precisión en uno de los dos testimonios. La credibilidad más afectada es la de Bolier. El más cercano a la verdadera realidad —hora— es el de Castilloveitía. Conforme a Bolier, "Petróleo" y los apelantes despedían olor a gasolina. ¿Tardaron tantas horas en recorrer una corta distancia urbana una vez cometido el crimen? ¿Fue que se detuvieron en otro lugar por varias horas antes de arribar al condominio? Comienza a inquietarnos su testimonio. Estas interrogantes son pertinentes para dirimir credibilidad, pues el alegado encuentro de Bolier con los apelantes y "Petróleo" se suscita poco tiempo después de aquél percibir el incendio.

En términos de tiempo el testimonio de Bolier falla. Es irreconciliable con el momento real del incendio. Dos posibilidades: ¿O se equivocó o mintió?

En el modus operandi, la teoría del Ministerio Fiscal sobre la causa y sitio en que se originó el siniestro no es armonizable con el testimonio de Castilloveitía. La manera, magnitud y celeridad de la conflagración es contraria a que fuera causado por una sola botella de cristal tipo "cóctel Molotov" lanzada desde la calle Comercio. Recuérdese que este testigo de cargo atestó que inmediatamente después de sentir que se rompió una botella de cristal y salir al balcón "el fuego estaba en *todo el techo* de la estructura". Los comentaristas y expertos sobre la materia coinciden en que de ordinario un fuego se desarrolla, alimenta y desplaza *de abajo hacia arriba* por razones físicas. Nos resulta difícil conciliar esa prueba con el fenómeno científico aludido y la realidad de que el balcón al frente de la estructura sufrió muy poco en el incendio.

Más aún, las fotografías e informes demuestran que el fuego se originó en el interior del local mediante el uso extenso de gasolina. Según elaboraremos más adelante, subsiste como enigma el análisis de laboratorio que no detectó ma-

terial inflamable en el pedazo de botella de "Pepsi". Ello tiende a debilitar, por no decir destruir, el testimonio de Castilloveitía.

Fuera de esta prueba, la convicción de los apelantes Cruz Granados y Camacho Ortiz descansa únicamente en el testimonio de Bolier, el cual a su vez se funda en una alegada admisión de "Petróleo" y sus observaciones, curiosamente a destiempo, horas más tarde de comenzado el siniestro.

En esta etapa analítica, se agudizan más las dudas. Primero, Bolier narró con dificultad, revistiendo su testimonio de poca espontaneidad, que "Petroléo" le dijo que llevó un galón de gasolina, penetró a la estructura con Camacho Ortiz y le pegó fuego. Ello dramatiza una contradicción inherente con el testimonio de Castilloveitía en cuanto al modus operandi antes aludido.

Segundo, la prueba del Ministerio Fiscal, según relacionada, únicamente identificó la presencia de material acelerante e incendiario en un envase plástico tipo galón, análogo a los descritos por "Petróleo". Que sólo se hubiese podido localizar un galón es más armonizable con su declaración de que tomaron las medidas para que los otros envases desaparecieran en el incendio.

Tercero, los grandes agujeros en el piso de la madera calcinada, presumiblemente infiltrada por la gasolina, se extendieron desde ese sitio de origen hacia atrás de la estructura. Ello es significativo. Marca un rastro que coincide con la ruta de huida que "Petróleo" explicó en su declaración jurada.

Percibimos un conflicto en términos de *espacio*. Según Bolier, los apelantes entraron, incendiaron y escaparon por la parte de atrás —saltaron la verja— mientras Castilloveitía ubica los autores en un automóvil en la calle Comercio, al frente del local. Se usó una botella, tipo Molotov. La única encontrada en el interior no presentó residuo alguno de combustible acelerante. Otra vez la evidencia del Ministerio Fiscal omite aclarar satisfactoriamente un detalle tan importante.

¿A qué se debió el resultado negativo de la prueba de laboratorio? Hemos visto cómo las pruebas de laboratorio mediante la técnica de cromatografía gaseosa pueden separar y detectar vestigios de hidrocarburo. Surgen varias interrogantes. ¿Por qué si se encontró parte de la botella de cristal "Pepsi" a raíz del siniestro (9 de mayo de 1979), no fue sometida al análisis de laboratorio conjuntamente con el practicado al galón plástico (*Exhibit* 1, Pueblo) el 11 de mayo? ¿Por qué se esperó hasta el 1ro de noviembre de 1979 para realizar ese análisis? ¿Afectó el transcurso del tiempo la posibilidad de descubrir científicamente los residuos de gasolina u otro acelerante? Estas preguntas no son simples conjeturas. Adviértase que, según las técnicas químico-forenses, existen pruebas de laboratorio capaces de detectar la presencia de dicha sustancia inflamatoria aun cuando estuviera sometida a los efectos directos del incendio.

Pero hay más. El examen del galón plástico produce serias vacilaciones. La prueba exclusivamente revela que lo ocupó el agente Valenzuela y contenía gasolina. Surge la primera pregunta: ¿en qué sitio específico? No sabemos. Observamos que el mismo es de material plástico natural, inclinándose hacia el color blanco. Tiene tapa de rosca azul. Su medida es un galón. Aparentemente es de los comúnmente disponibles en los comercios para envasar líquidos de radiador y otros productos fluidos automotrices análogos. Aún conserva una etiqueta color roja cuyo impreso lee "Bargain Town" número 2.48 (presumiblemente el precio), y la palabra *omotive*, que creemos corresponde a *automotive*. También nos fijamos en que su color plástico natural está manchado por la suciedad típica de grasa. A simple vista no presenta hollín ni residuos de ceniza. Tiene algunas manchas que parecen ser impresiones dactilares. Otra vez afloran las dudas. ¿Existían al momento de ser ocupado? ¿Son el resultado de su posterior manipulación? ¿Por qué no se investigaron en laboratorio para tratar de identificarlas?

Finalmente, la incógnita más impactante es que este galón quedó intacto. Increíblemente no sufrió los efectos de las altas temperaturas y del calor que generó el incendio. Tomamos conocimiento judicial de que el plástico es un material que se derrite al ser sometido a altas temperaturas del elemento ígneo. Si estaba en el interior debió desaparecer.

Repetimos, nos preocupa la ausencia de prueba del lugar exacto en que fue localizado. Hemos meditado sobre las posibles razones para que dicho galón sobreviviera intacto en el incendio. Las mismas —dejado inadvertidamente y por descuido de los autores fuera del área del incendio, o a propósito y convenientemente, o que no se dio la expectativa de que se consumiera— crean un incomprensible y profundo vacío evidenciario.

Esta laguna unida a las contradicciones e interrogantes apuntadas, nos producen unas incertidumbres reales y racionales en nuestro ánimo adjudicativo. Proyectémoslas sobre la norma jurídica que conocemos como *duda razonable*.

## IV

Refiere la duda razonable en su sentido lexicográfico una "indeterminación del ánimo entre dos juicios o dos decisiones", o una "[s]uspensión voluntaria y transitoria del juicio para dar espacio y tiempo al espíritu a fin de que coordine todas sus ideas y todos sus conocimientos", razonablemente, esto es, "[c]onforme a la razón". *Diccionario de la Lengua Española,* Real Academia Española, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, págs. 518, 1147. En su significado jurídico, nuestra jurisprudencia la ha visualizado como que "no es meramente una duda posible. Existe duda razonable cuando después de un cuidadoso análisis, examen y comparación de toda la prueba queda el ánimo de ustedes en tal situación, *que no pueden decidir si tienen una firme convicción o certeza moral con respecto a la verdad de los hechos envueltos en la acusación.* Esto no significa que deba destruirse toda duda posible ni

que la culpabilidad del acusado tenga que establecerse con certeza matemática, sino que la evidencia debe producir aquella certeza moral que convence, dirige la inteligencia y satisface la razón. Duda razonable es una duda fundada, producto del raciocinio de todos los elementos de juicio envueltos en el caso. No debe ser pues, una duda especulativa o imaginaria. La duda que justifica la absolución no sólo debe ser razonable, sino que debe surgir de una serena, justa e imparcial consideración de toda la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación". (Énfasis suplido.) *Instrucciones al Jurado para el Tribunal Superior*, 2da ed., San Juan, Ed. Col. Abo. P.R., 1977, pág. 42.

Esta instrucción de carácter definitorio reproduce expresamente la terminología utilizada por este foro. *Pueblo* v. *Gagot Mangual*, 96 D.P.R. 625, 626–627 (1968); *Pueblo* v. *Malavé Sánchez*, 95 D.P.R. 395, 399 (1967); *Pueblo* v. *Ortiz Morales*, 86 D.P.R. 456, 468 (1962); *El Pueblo* v. *Vilar*, 17 D.P.R. 1054, 1057 (1911); *El Pueblo* v. *Dones*, 9 D.P.R. 469, 478 (1905).

El principio es de raíz anglosajona. Se remonta a finales del siglo XVII. Se usó por primera vez en casos sujetos a la aplicación de la pena capital.[3] Evolucionó bajo el crisol de la

---

[3] En un escrito publicado en 1876, el Juez May atribuye su origen a los casos de *Finneys* y *Bond* litigados en Dublin en 1798, 27 How. St. Tr. 523 (Ire. 1798); 27 How. St. Tr. 1019 (Ire. 1798); C. J. May, *Some Rule of Evidence: Reasonable Doubt in Civil and Criminal Cases*, 10 Am. L. Rev. 642 (1876) citado en J. H. Wigmore, *Evidence in Trials at Common Law*, Boston, Little, Brown & Co., 1981, Sec. 2497, págs. 316–317. C. T. McCormick, *Evidence*, Minnesota, West Pub. Co., 1984, Sec. 341, pág. 962 n. 5; A. Morano, *A Reexamination of the Development of the Reasonable Doubt Rule*, 55 B.U.L. Rev. 507, 508 (1975); T. Waldman, *Origins of the Legal Doctrine of Reasonable Doubt*, 20 J. History of Ideas 299 (1959).

No obstante, se ha planteado que el caso de *Weldon* previo a estos últimos, contiene un lenguaje inequívoco atribuible al concepto de la duda razonable, por lo que amerita su reconocimiento como primicia jurídica. Morano, *op. cit.*, pág. 516. Así se configuró en esta expresión histórica del Juez Chamberlain: "If it should appear, beyond all doubt that these acts were done by the prisoner [then you should convict]. But unless you are

casuística(⁴) al punto de requerirse que la culpabilidad se probase conforme a criterios como "una impresión clara", "sobre bases claras", "duda racional",(⁵) "duda racional bien

---

perfectly satisfied . . . you must acquit . . . if from the special circumstances any rational doubt rest upon your minds, it will be your duty to acquit the prisoner." 26 How. St. Tr. 225, 280–281, 286 (Ire. 1795).

(⁴) Se advierte también el contenido de esta figura en el Derecho anglo-americano, en *State* v. *Wilson*, 1 N.J.L. 502, 1 Coxe, 439 (Nisi Prius 1793) y *Rex* v. *Preston and Rex*, y *Rex* v. *Wemms*. Este último distingue el concepto de "cualquier duda" del estándar de duda razonable de persuasión. Morano, *op. cit.*, págs. 515–516. Waldman, en un escrito memorable también reporta los frutos de su investigación en la búsqueda de las raíces del concepto estudiado y le atribuye una génesis religiosa. Confiere su primer uso a Christopher Potter en su obra *Want of Charity Justly Charged on all such Romanists, as Dare (without truth or modesty) affirm, that Protestancy destroyeth Salvation. In answer to a late popish pamphlet, intituled, Charity Mistaken, &c.* (1633). William Chillingworth en su obra *Religion of Protestants, &c.* reproduce los requisitos que Potter esboza para sostener una convicción que envuelve una violación a los postulados de la fe cristiana:

"These are (1) clear revelation, (2) sufficient proposition, and (3) capacity and understanding in the hearer. With regard to (2) Potter states: 'To sufficient proposition, he requires two things: 1. That the points be perspicuously laid open in themselves. 2. So forcibly, as may serve to *remove reasonable doubts to the contrary*, and satisfy a teachable mind concerning it, against the principles in which he hath been bred to the contrary.' Potter goes on to say, concerning (3): 'The third thing he requires, is capacity and ability to apprehend the proposal, and the reason of it: the want whereof excuseth fools and madmen, &c. But where there is no such impediment, and the will of God is sufficiently propounded, there (sayeth he) be that opposeth is convinced of error; . . .' Point three is important in that some criteria for a *reasonable man* who can come to a decision intelligently is set forth; criteria which were to have significance in the development of the legal concept of reasonable doubt." Waldman, *op. cit.*, pág. 302 n. 12.

(⁵) El influjo de la "razón" al derecho promovido por los filósofos ingleses John Wilkins, Robert Boyle, Joseph Glanville y John Locke, llevó a una superación del concepto de la certidumbre moral como equivalente a certeza absoluta. Para ellos era suficiente que no existiera una duda razonable acerca de las creencias. Morano, *op. cit.*, pág. 513. Esta expresión constituye la génesis doctrinaria de "la duda razonable". Thomas Starkie, en uno de los primeros tratados de evidencia reportados, titulado *A Practical Treatise of the Law of Evidence*, publicado en 1860, define este concepto como "moral certainty to the exclusion of every reasonable doubt . . .", citado en Waldman, *op. cit.*, pág. 300. Recuérdese que el concepto de un "hombre prudente y razonable" también se genera en esta época. A su vez, los principios fundamentales que regulan la admisibilidad de la evidencia reflejaban la necesidad de un sistema racional en la presentación de la prueba que facilitara

fundamentada" y "más allá de una probabilidad de duda". Finalmente emergió el concepto de "duda razonable", criterio de aproximación judicial tricentenario adoptado jurisprudencialmente, (⁶) y como axioma constitucional por toda sociedad democrática, independientemente de que sus raíces sean anglosajonas o latinas. (⁷) J. H. Wigmore, *Evidence in Trials at Common Law*, Boston, Little, Brown & Co., 1981, Sec. 2497, págs. 316–325; C. T. McCormick, *Evidence*, Minnesota, West Pub. Co., 1984, Sec. 341, pág. 962.

La máxima que nos ocupa es consustancial con el principio de la presunción de inocencia. May, citado en Wigmore, *op. cit.*, págs. 409–410; Morano, *op. cit.*, pág. 509; *Coffin* v. *United States*, 156 U.S. 432, 455 (1895). Estas consideraciones impulsaron al Tribunal Supremo federal a conferir protección al

---

la "deliberación" del jurado. Era de esperarse, pues, que la noción de la razón se incorporase como un indicador para medir el estándar de persuasión necesario para concluir la existencia de duda razonable. Morano, *op. cit.*, pág. 514.

(⁶) Se incorpora formalmente en la jurisprudencia norteamericana a mediados de siglo XVIII. En algunos estados —Nueva York y Carolina del Norte— comenzó a utilizarse en 1820 y en otros a partir del 1850. Aún así, no puede hablarse de una aplicación uniforme o una aceptación general en el derecho angloamericano. De hecho, prevalece un criterio dividido en las autoridades respecto a quién viene obligado a persuadir y en qué medida debe hacerlo. En algunas jurisdicciones el acusado debe persuadir por la preponderancia de la prueba, mientras que en otras al Ministerio Público se le requiere hacerlo más allá de duda razonable. Esta última es "preferible" y por lo menos en algunas circunstancias puede ser requerida como un elemento del debido proceso de ley. W. R. LaFave y A. W. Scott, *Handbook on Criminal Law*, Minnesota, West Pub. Co., 1972, pág. 44; Morano, *op. cit.* pág. 519.

(⁷) Desde esta vertiente lo vemos consagrado en la máxima atribuida a Ulpiano, según aparece recogida en la obra, *El Digesto del Emperador Justiniano*, de Bartolomé Agustín Rodríguez de Fonseca:

*"Sed nec de suspicionibus debere aliquem damnari Divus Traianus Adsiduo Severo rescripsit; satius enim esse, impunitum relinquit facinus nocentis quam inocentem damnare".* ("Tampoco ha de ser condenado alguno por sospechas, como respondió el mismo Emperador Trajano a Asiduo Severo; porque es mejor dejar sin castigo el delito del culpado que condenar al que está inocente.") Citado en L. Jiménez de Asúa, *Tratado de Derecho Penal*, 2da ed., Buenos Aires, Ed. Losada, 1950, T. II, pág. 469.

acusado, reafirmando, como un elemento del debido procedimiento de ley, que se establezca su culpabilidad más allá de duda razonable. *In re Winship*, 397 U.S. 358 (1970).(8)

Semejante aproximación histórica nos conduce indubitadamente al imperio absoluto del principio *in dubio pro reo* (9) en materia procesal penal cuando no están totalmente probados los hechos que se imputan al acusado. L. Jiménez de Asúa, *Tratado de Derecho Penal*, 2da ed., Buenos Aires, Ed. Losada, T. II, pág. 469. Ello significa pura y simplemente, que en caso de duda, hay que preferir la impunidad de un culpable a la condena de un inocente. E. Gómez Orbaneja y V. Herce Quemada, *Derecho Procesal Penal*, 8va ed., Madrid, Eds. S.A., 1975, pág. 263.

---

(8) En esa histórica opinión se pronunció: "[e]xpressions in many opinions of this Court indicate that it has long been assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required. . . . The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence —that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law'. . . . The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is a reasonable doubt about his guilt". *In re Winship*, 397 U.S. 358, 362–364 (1970).

(9) Se ha sostenido que en derecho penal el principio *in dubio pro reo* (*in dubio mitius*) sólo es admisible en el caso de duda sobre la prueba o sobre la culpabilidad del acusado. R. Maurach, *Tratado de Derecho Penal*, Barcelona, Ed. Ariel, 1962, pág. 106; Florian, *Trattato di Diritto Penale*, 1.°, pág. 191, citado por E. Cuello Calón, *Derecho Penal*, 18va ed., Barcelona, Ed. Bosch, 1980, T. I, Vol. I, págs. 217–218; Bettiol, *Diritto Penale*, pág. 102, citado por Cuello Calón, *op. cit.*, pág. 218. Jiménez de Asúa, *op. cit.*, pág. 469. Por su parte, E. Gómez Orbaneja y V. Herce Quemada opinan que el axioma *in dubio pro reo* debe extenderse no sólo a los hechos constitutivos del delito, sino también a la imputabilidad, la culpabilidad y las causas obstativas excluyentes de la responsabilidad y la punibilidad. *Derecho Procesal Penal*, 8va ed., Madrid, Eds. S.A., 1975, pág. 264. Para Sabatini, este principio comprende la máxima *favor libertatis* como principio general de Derecho. Jiménez de Asúa, *op. cit.*, pág. 469.

En su función propia el principio puede compendiarse así: "[L]a falta de prueba de la culpabilidad equivale a la prueba de la inocencia." Gómez Orbaneja y Herce Quemada, *op. cit.*, pág. 265.

## V

Nuestro ordenamiento jurídico constitucional, uno de los más avanzados, consagra definitivamente la presunción de inocencia como uno de los derechos humanos que asiste a todo acusado. Constitución del E.L.A., Art. II, Sec. 11.

Su implementación conlleva que el Estado pruebe la culpabilidad del acusado más allá de duda razonable. *Pueblo* v. *Carrasquillo*, supra, pág. 552. Reafirmamos la norma de deferencia a los jueces de instancia y a los jurados en la apreciación de la prueba. *Pueblo* v. *Pagán Díaz*, 111 D.P.R. 608, 621 (1981). Sin embargo, en casos de naturaleza criminal dicha deferencia no puede tener el mismo alcance que atribuimos a la adjudicación en el procedimiento civil. La evaluación crítica, racional e integral de la prueba nos confiere una facultad más amplia para emitir un juicio cuidadoso y concienzudo sobre la verdad procesal. La prueba, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación". *Pueblo* v. *Carrasquillo*, supra, pág. 552. Después de todo, la insatisfacción de la conciencia del juzgador en cuanto a la culpabilidad de un acusado, una vez desfila la totalidad de la prueba, es lo que se conoce como duda razonable. *Pueblo* v. *Toro Rosas*, 89 D.P.R. 169, 175 (1963). No puede esperarse menos. El respeto que nos merezca la libertad determinará los senderos de nuestra sociedad como una verdaderamente civil y democrática. Nuestra función es darle contenido al precepto constitucional en su sentido teleológico más profundo. Procedamos.

Excluido el testimonio del testigo de cargo Castilloveitía —que no arroja luz sobre la identidad de los autores del incen-

dio y cuya declaración es sumamente frágil— el tribunal de instancia basó su fallo en prueba circunstancial dirigida a sostener la versión del testigo Bolier fundado en unas admisiones y observaciones que incriminan a los apelantes. Le mereció crédito. Sin embargo, hemos visto cómo dicho testimonio fue confuso e impreciso en extremos importantes. Con vista a un examen directo y a una evaluación de la prueba documental y objetiva, hemos demostrado la existencia de muchas interrogantes y serias lagunas no explicadas. También, cómo surgen dudas sobre la confiabilidad de la evidencia tangible. El valor residual probatorio de la poca evidencia circunstancial que queda es escaso. No es suficiente para rubricar el alegado relato incriminatorio de Bolier contra los apelantes.

En un recto balance valorativo, el tribunal a quo no podía descartar el testimonio del cabo de la Guardia Municipal Negrón Castro. Éste proveyó un móvil para el crimen y explicó que hubo terceras personas que por razones político-partidistas autorizaron el incendio y encomendaron su ejecución a "Petróleo" y al ex agente del N.I.C. Jorge González, "Georgie". Este aspecto fue corroborado por José A. Rodríguez Ortiz, "Petróleo", quien por propia declaración se atribuyó la comisión del delito, fue convicto y descartó la participación de los apelantes en la acción criminosa.

¿Cuál de estas versiones es la cierta? No lo sabemos. Teóricamente ambas son plausibles. La que menos erosión sufre es la de la defensa. En éstas, las partes del rompecabezas evidenciario —móvil, autores, secuencia cronológica, espacio y modus operandi— encajan más fácilmente. Sin embargo, nuestra conciencia judicial pausa en este caso ante lo irresoluble de la verdad forense. Todos los esfuerzos encaminados a descubrirla han resultado infructuosos. En el descargo del ministerio judicial no caben las especulaciones. Tampoco cegarnos ante las múltiples incógnitas, lagunas y contradicciones que el examen global y concienzudo de la prueba revela. No es simple recelo o titubeo judicial. Es mucho más. "El es-

tado mental de seguridad de que una proposición es verdadera se llama *certeza*, y el de inseguridad acerca de si una proposición es o no verdadera, debida a la creencia de la posible verdad de la proposición contradictoria, se denomina *duda*, la cual importa la prudente suspensión de todo juicio categórico." J. M. Mans Puigarnau, *Lógica para Juristas*, Barcelona, Ed. Bosch, 1969, pág. 172. Esta incertidumbre fundada en el análisis esmerado y racional que ha precedido, nos crea una insuperable vacilación decisoria. La identificamos como duda razonable. Por mandato constitucional favorece a los apelantes.

El Juez Asociado Señor Torres Rigual no intervino. El Juez Asociado Señor Rebollo López se inhibió.