Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL (VII)

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>ALEXANDER RODRÍGUEZ LUNA<br><br>Apelante | KLAN202301003 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso núm.: NSCR202100535 |
|---|---|---|

Panel integrado por su presidenta la jueza Ortiz Flores, la jueza Romero García y el juez Rivera Torres.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 16 de diciembre de 2025.

Comparece ante este tribunal apelativo, el Sr. Alexander Rodríguez Luna (señor Rodríguez Luna o el apelante), mediante el escrito de *Apelación* de epígrafe solicitándonos que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Fajardo (TPI), el 24 de octubre de 2023, archivada en autos el 26 de octubre siguiente. En dicho dictamen, se condenó al apelante a una pena total de 129 años de prisión, a cumplirse de manera concurrente.

Por los fundamentos que expondremos a continuación, se confirma el dictamen apelado.

### I.

Por hechos acaecidos allá para el 6 de febrero de 2020 en el municipio de Fajardo, el Ministerio Público presentó varias denuncias contra el señor Rodríguez Luna y otros coacusados por actuar en común acuerdo e infringir el Artículo 93(d) del Código Penal de 2012 (Asesinato en primer grado); Artículo 6.05 (Portación, Transportación o Uso de Armas de Fuego sin Licencia); Artículo 6.09 (Portación, Posesión o Uso Ilegal de Armas Largas Semiautomáticas,

Automáticas o Escopeta de Cañón Cortado); y Artículo 6.14(B) (Disparar o Apuntar Armas de Fuego), estos de la Ley de Armas de 2020.

Luego de varios trámites procesales, innecesarios pormenorizar, se celebró el juicio por jurado durante varios meses, en un total de diez (10) vistas, comenzando el 22 de mayo de 2023 y culminando el 23 de agosto del mismo año. El Ministerio Público presentó diez (15) testigos de cargo, a saber:

1. Agte. Luis M. García Díaz
2. Sra. Carmen López Ramos
3. Agte. Lázaro D. Ramos Torres
4. Agte. David Cardona Rivera
5. Sra. María Hernández Miranda (Técnico de Control y Custodia de Evidencia del Instituto de Ciencias Forenses (ICF))
6. Sr. Felix Vázquez Solís (Técnico de Control y Custodia de Evidencia del ICF)
7. Sr. Alex Cintrón Castellano (Supervisor e Investigador del ICF)
8. Dra. Rosa Rodríguez Castillo (Patóloga del ICF)
9. Agte. Jasmine Giustino Falú
10. Sra. Carmen S. Suliveras Ortiz (Examinadora Arma de Fuego del ICF)
11. Sra. Itzel Rodríguez Caraballo
12. Sr. Juan Gabriel Cruz Torres
13. Sr. Carlos Serrano Vega
14. Sra. Windalys Torres Santiago (Seróloga Forense del ICF)
15. Agte. Raúl O. Velázquez Paz

La defensa, por su parte, presentó como testigo al Agente Luis E. Alejandro Velásquez y durante su testimonio fue marcada como Exhibit 2 las notas de la Sra. Nuria Cruz González.

A continuación, consignamos un breve resumen de los testimonios vertidos:

> El Agente de la Policía, el Sr. Luis M. García Díaz, declaró que el 6 de febrero de 2020 recibió una llamada telefónica para corroborar unas aparentes detonaciones realizadas por un vehículo color negro con biombos, a eso de la nueve de la noche, en el residencial Puerto Real en Fajardo.[1] Testificó que, en la escena, encontró varios casquillos de balas y una pared impactada por proyectiles.[2] Relató que, acto seguido, acudió al residencial Pedro Rosario Nieves, así como a un sector llamado Villa Polilla para localizar el paradero del vehículo.[3] En este último lugar, expresó que halló

---

[1] *Véase*, Transcripción de la Prueba Oral (TPO) del 22 de mayo de 2023, a las págs. 114-115 y 119.
[2] *Íd.*, a la pág. 117.
[3] *Íd.*, a las págs. 119-120.

una Hyundai Tucson de color negro que tenía en su parte frontal un biombo y lo que parecía por su experiencia un casquillo de bala en la parte trasera.[4] Luego de ello, notificó al Centro de Mando para informar que ocupó dicho vehículo.[5] Sostuvo que, entre las detonaciones y la ocupación del vehículo transcurrió aproximadamente dos (2) horas.[6] El Agente García Díaz identificó el vehículo a través de fotografías.[7]

Durante el contrainterrogatorio, se le realizaron preguntas sobre los motivos por el cual acudió a dichos lugares, así como los visuales.[8] Al respecto, testificó que fue al residencial Pedro Rosario Nieves ya que era más accesible desde Puerto Real y, de manera subsiguiente, se encontraba Villa Polilla.[9] En cuanto los visuales, señaló que a los policías le asignaban una linterna con una luz LED de alto luminiscencia con buen alcance por lo que pudo identificar el vehículo en la oscuridad.[10]

La Sra. Carmen López Ramos declaró que era la madre de la Sra. Franchesca Esquilín López, quien falleció por los eventos que se llevaron a cabo el 6 de febrero de 2020.[11] Durante su interrogatorio, estableció el paradero de su hija durante los sucesos e identificó la occisa mediante fotografía.[12]

El Agente de la Policía, el Sr. Lázaro Ramos Torres, declaró en cuanto a las anotaciones que hizo al investigar la querella del 6 de febrero de 2020.[13] En atención a lo anterior, expresó que en la escena encontró múltiples casquillos de balas y que habían resultado dos personas heridas por balas, el Sr. Jomar Ramos Vega y la Sra. Franchesca Esquilín López.[14] De igual forma, testificó que se ocupó un Mitsubishi *Mirage* de color blanco del 1997, con la tablilla JCQ 976.[15]

El Agente David Cardona Rivera, técnico del CIC, declaró en cuanto a sus funciones, a saber, fotografiar, recolectar y procesar todo tipo de evidencia según la investigación.[16] Destacamos que, las fotografías y el croquis de la escena realizado por el agente fueron estipulados por las partes.[17] Respecto al interrogatorio, testificó que los múltiples casquillos de balas de diferentes calibres que fueron levantados en la escena, fueron embalados, individualizados y transportados a un lugar con seguridad para posteriormente ser llevados al Instituto de Ciencias Forenses y solicitar su análisis.[18] A su vez, relató que recogió un hisopo de

---

[4] *Íd.* a las págs. 120-121.
[5] *Íd.*, a la pág. 122.
[6] *Íd.*, a las págs. 122-123.
[7] *Íd.*, a la pág. 125.
[8] *Íd.*, a las págs. 136-138.
[9] *Íd.*, a la pág. 149.
[10] *Íd.*
[11] *Íd.*, a la pág. 158.
[12] *Íd.*, a las págs. 160-161.
[13] *Véase,* TPO del 23 de mayo de 2023, a la pág. 176.
[14] *Íd.*, a las págs. 177, 179 y 181.
[15] *Íd.*, a las págs. 181-182.
[16] *Íd.*, a la pág. 189.
[17] *Íd.*, a las págs. 190-191.
[18] *Íd.*, a la pág. 192.

sangre cerca de un vehículo Mitsubishi Mirage Blanco, el cual presentaba impactos de proyectiles.[19]

De ahí, expresó que acudió a la próxima escena donde se custodiaba un vehículo Hyundai Tucson por instrucciones del Agente Raúl Velázquez Paz.[20] Allí, fotografió el vehículo y embaló un casquillo de 9 milímetros para ser transportado y analizado.[21] Además, señaló que en el *dash* del vehículo se encontraba un biombo.[22] Después, se presentó con el Agente Raúl Velázquez Paz al Hospital *Caribbean* de Fajardo porque ahí se encontraba la occisa, la cual tenía una herida a causa del paso de proyectil de una bala.[23] Durante el contrainterrogatorio, declaró que aparte del hisopo no recogió otro tipo de muestra de ADN en la escena.[24]

La Sra. María Hernández Miranda, técnica de control y custodia de evidencia del Instituto de Ciencias Forenses, declaró sobre la evidencia que recibió y la cadena de custodia.[25] En particular, expresó que recibió del Agente David Cardona Rivera noventa y ocho (98) casquillas de balas, tres (3) balas y un casquillo de bala, así como un aplicador de ADN.[26] Por otra parte, testificó que recibió del Agente Raúl Velázquez Paz dos rifles que fueron ocupados en evidencia.[27]

El Sr. Félix Vázquez Solís, técnico de control y custodia del Instituto de Ciencias Forenses, declaró que recibió cincuenta y nueve (59) casquillos de bala del cuarto de evidencia del CIC en Fajardo que fueron recolectados en el residencial Puerto Real.[28]

El Sr. Alex Cintrón Castellano, investigador forense y Supervisor en el Instituto de Ciencias Forenses, declaró sobre el proceso a seguir en cuanto un análisis de un vehículo de motor.[29] No obstante, expresó que no tuvo una participación directa en el presente caso, sino que fungió como supervisor y que entre sus labores estaba revisar el expediente y el informe realizado por el investigador primario y, por consiguiente, firmarlo.[30] Durante el contrainterrogatorio, confirmó que el Mitsubishi Mirage contenía cuatro perforaciones por balas y que se recuperó dentro del vehículo dos proyectiles y un fragmento.[31]

La Dra. Rosa Mariam Rodríguez Castillo, patóloga forense para el Instituto de Ciencias Forenses, fue cualificada como perito en patóloga forense.[32] Declaró que, fue quien le realizó la autopsia a la Sra. Franchesca Esquilín López.[33] Expresó que durante la autopsia se identificó heridas de balas en la espalda,

---

[19] *Íd.*, a las págs. 199 y 203.
[20] *Íd.*, a las págs. 210-211.
[21] *Íd.*, a las págs. 211-212.
[22] *Íd.*, a las págs. 214-215.
[23] *Íd.*, a la pág. 215.
[24] *Véase*, TPO del 24 de mayo de 2023, a las págs. 231-232.
[25] *Íd.*, a las págs. 258, 261-262 y 264-265.
[26] *Íd.*, a las págs. 262 y 265-266.
[27] *Íd.*, a la pág. 274.
[28] *Íd.*, a las págs. 287-288.
[29] *Véase*, TPO del 25 de mayo de 2023, a la págs. 298-302.
[30] *Íd.*, a las págs. 302-303 y 308.
[31] *Íd.*, a la pág. 313.
[32] *Véase*, TPO del 26 de mayo de 2023, a las págs. 350-351.
[33] *Íd.*, a la pág. 352.

glúteo y en el antebrazo izquierdo, por lo que la persona fue disparada por detrás y no se puede defender.[34] Además, explicó que, dado las particularidades de la herida, esta fue creada a más de dos pies de la boca del cañón.[35] En este sentido, atribuyó la causa y manera de muerte a las heridas bala.[36]

El Agente Jazmín Giustino Falú, Policía en el Centro de Recopilación, Análisis y Diseminación de Inteligencia Criminal (CRADIC) en Humacao, declaró que su intervención en el caso fue la extracción de videos de cámaras de seguridad en tres (3) lugares distintos según solicitado por el Agente Raúl Velázquez Paz.[37] Indicó que las extracciones se llevaron a cabo en *Lawn Mower Service*, Valle Vista Real *Apartments* y en unas instalaciones de la Autoridad de Acueductos y Alcantarillados.[38] En esta línea, sostuvo que el agente investigador era quien observaba y analizaba los videos, además, que escogía lo que necesitaba.[39] No obstante, el TPI ordenó el desglose de los videos.[40]

La Sra. Carmen Suliveras Ortiz, examinadora de armas de fuego para el Instituto de Ciencias Forenses, fue cualificada como perito en el área de armas de fuego y herramientas.[41] Esta declaró que recibió del Agente David Cardona Rivera una solicitud para examinar noventa y ocho (98) casquillos de bala, tres (3) balas y un casquillo de bala proveniente de un vehículo.[42] Testificó que los resultados demostraron que se dispararon seis (6) armas de fuego en la escena, los cuales tres eran calibre .223 y los otros tres eran 9 milímetros.[43] De igual forma, relató que se sometió para examen un rifle marca *Smith & Wesson* modelo MP15, calibre 5.56, con número de serie ST44-931.[44] Sostuvo que, dicho rifle disparó vente (20) casquillos de los sometidos en evidencia.[45] Por otra parte, recibió una pistola modelo AR15 *Type*, calibre 5.53, con marca y número de serie desconocido.[46] No obstante, señaló que dicha pistola no disparó ninguno de los casquillos sometidos en evidencia.[47]

La Sra. Itzel Rodríguez Caraballo, declaró que, para febrero de 2020, convivía con el Sr. Carlos Serrano Vega en el residencial Pedro Rosario Nieves. [48] Expresó que, tras una llamada de la Sra. Josefa Figueroa, madre del señor Carlos Serrano Vega, acudió a un monte cerca del barrio Sardinera en búsqueda de unas armas que habían tirado en una funda de basura.[49] Relató que dicho monte quedaba cerca de la vivienda de la señora Josefa Figueroa.[50] Testificó que, en el monte, abrió la

---

[34] *Íd.*, a las págs. 363-364.
[35] *Íd.*, a la pág. 359.
[36] *Íd.*, a la pág. 364.
[37] *Íd.*, a las págs. 384-385 y 388.
[38] *Íd.*, a la pág. 389.
[39] *Íd.*, a la pág. 392.
[40] *Véase*, TPO del 7 de agosto de 2023, a las págs. 616-617.
[41] *Véase*, TPO del 1 de agosto de 2023, a la pág. 458.
[42] *Íd.*, a la pág. 459.
[43] *Véase*, TPO del 2 de agosto de 2023, a la pág. 486.
[44] *Íd.*, a las págs. 490-491.
[45] *Íd.*, a las págs. 494-495.
[46] *Íd.*, a la pág. 502.
[47] *Íd.*, a las págs. 502-503.
[48] *Véase*, TPO del 3 de agosto de 2023, a la pág. 547.
[49] *Íd.*, a las págs. 547-548.
[50] *Íd.*, a la pág. 548.

funda y encontró dos bultos, señaló que uno de los bultos contenía drogas y el otro que no lo abrió pero que se sentía pesado.[51] Así pues, metió los bultos dentro de un cajón de ropa, lo puso dentro del carro y se los llevó al residencial Pedro Rosario Nieves.[52] Declaró que, en el residencial, la Sra. Nayda cogió el cajón y se lo llevó.[53] Sostuvo que, el próximo día recibió una llamada del señor Carlos Serrano Vega para que llegara a Sardinera, lo cual hizo.[54] Allí, observó muchos policías y el señor Carlos Serrano Vega dentro de una de las patrullas de los oficiales.[55] Relató que, notificó a los oficiales que había movido la funda del monte y los dirigió hacia Veve Calzada donde estaban los bultos.[56]

El <u>Sr. Juan Gabriel Cruz Torres</u>, declaró que el 6 de febrero de 2020, se montó en una Hyundai Tucson con varios individuos, entre ellos, el acusado, para tirotear el residencial Puerto Real.[57] A tales efectos, identificó al señor Rodriguez Luna en sala.[58] Testificó que, en el lugar, se bajaron todos del vehículo y procedieron a disparar, incluyendo el acusado, el cual estaba armado con una pistola.[59] Luego de ello, expresó que se montaron nuevamente en la guagua y se dirigieron al barrio Villa Polilla para dejar el vehículo.[60]

El <u>Sr. Carlos Serrano Vega</u>, declaró que, para febrero de 2020, vivía y "bregaba" con armas en el residencial Pedro Rosario Nieves.[61] Explicó que esto consistía en limpiar, guardar y hacer automática las armas.[62] En cuanto al incidente del 6 de febrero de 2020, expresó que ese día estaba en su hogar hablando con el Sr. Wilfredo Navarro y el Sr. Frank Quiñones, conocidos como Macuto y Real G, respectivamente.[63] Acto seguido, acudió al barrio Sardinera, en Fajardo, en busca de unas armas ya que mencionados individuos "iba[n] a hacer una vuelta", lo cual describió como dar a muerte a alguien.[64] Relató que, dichas armas las guardaba debajo de la casa de su madre en un bulto color negro.[65] De igual forma, testificó que se dirigieron a un apartamento invadido para buscar más armas.[66] Así, declaró que, luego de estar armados, el señor Wilfredo Navarro, el señor Frank Quiñones, el acusado, entre otros, se montaron en una Hyundai Tucson color negro con biombos y que se fueron del residencial.[67]

Esbozó que, después de media hora escuchó detonaciones y mediante un escáner contactó a uno de los individuos a lo cual le indicaron que estaban en Villa Polilla.[68] Expresó que, acudió al lugar en un

---

[51] *Íd.*, a las págs. 548-549.
[52] *Íd.*, a la pág. 549.
[53] *Íd.*, a las págs. 549-550.
[54] *Íd.*, a la pág. 551.
[55] *Íd.*
[56] *Íd.*, a las págs. 552-553.
[57] *Véase*, TPO del 7 de agosto de 2023, a las págs. 623-625.
[58] *Íd.*, a las págs. 623 y 641.
[59] *Íd.*, a las págs. 629-632
[60] *Íd.*, a las págs. 632-633.
[61] *Véase*, TPO del 8 de agosto de 2023, a la pág. 686.
[62] *Íd.*
[63] *Íd.*, a las págs. 687 y 689.
[64] *Íd.*, a las págs. 689-690.
[65] *Íd.*
[66] *Íd.*, a la pág. 692.
[67] *Íd.*, a las págs. 691-693.
[68] *Íd.*, a las págs. 694-695.

Mitsubishi Mirage y que se encontró a varias personas incluyendo al señor Rodríguez Luna.[69] Por consiguiente, esgrimió que los individuos pusieron las armas en el baúl de su vehículo y él procedió a irse a Sardinera para guardarlas en un bulto.[70] Declaró que, le notificó al Agente Raúl Velázquez Paz el paradero de uno de los rifle a cambio de la protección por ser testigo.[71] A tales efectos, escoltado por los agentes del CIC fue a Sardinera en búsqueda de las armas.[72] Por último, identificó al señor Rodríguez Luna en sala.[73]

Durante el contrainterrogatorio, señaló que, en la declaración jurada del 3 de marzo de 2020, no incluyó a el señor Rodríguez Luna entre los individuos que se montaron en el vehículo.[74] Por otra parte, indicó que cuando acudió a Villa Polilla no vio una Tucson negra.[75]

La Sra. Windalys Torres Santiago, seróloga forense de la Institución de Ciencias Forenses de San Juan, fue cualificada como perito en serología.[76] Esta declaró que analizó los aplicadores identificados con el número 64 y las letras B, C, D, I y J y, una colilla levantada en la Hyundai, Tucson.[77] Relató que, en esencia, los resultados demostraron que: (1) no se detectó ADN humano; (2) no se detectó ADN humano suficiente; (3) se detectó un perfil genético que no concordaba con la muestra de referencia de la occisa; o (4) se presentó un perfil genético inconcluso.[78]

El Agente de la Policía, el Sr. Raúl Omar Velázquez Paz, declaró que era el agente principal de la investigación que se llevó a cabo el 6 de febrero de 2020.[79] Explicó que su participación consistía en investigar la escena, entrevistar a los testigos de cargo y de entregar y recoger la evidencia en Forense.[80] A tales efectos, visitó la escena en Puerto Real, el Hospital *Caribbean* y Villa Polilla.[81] Testificó que, en el residencial Puerto Real, se ocupó en evidencia noventa y ocho (98) casquillos de bala de 9 mm, 5.56 mm de rifle y .223 de rifle, un Mitsubishi Mirage color blanco con tablilla JCQ 967, balas y sangre.[82] En Villa Polilla, indicó que se halló y ocupó una Hyundai Tucson y un casquillo de bala de 9 milímetros.[83] En el Hospital *Caribbean*, relató que entrevistó a la doctora y tomó fotografías de la occisa.[84]

Así, declaró que, realizó entrevistas en distintas partes y que eventualmente entrevistó al Sr. Juan Gabriel Cruz Torres, ya que este quería hablar sobre un asesinato.[85] Testificó que, el señor Juan Cruz Torres le notifica que participó en la muerte de la Sra.

---

[69] *Íd.*, a las págs. 695-696.
[70] *Íd.*, a las págs. 696-698.
[71] *Íd.*, a las págs. 699-700.
[72] *Íd.*, a la pág. 702.
[73] *Íd.*, a las págs. 708-709.
[74] *Íd.*, a la pág. 728.
[75] *Íd.*, a la pág. 729.
[76] *Véase*, TPO del 9 de agosto de 2023, a la pág. 749.
[77] *Íd.*, a la pág. 754.
[78] *Íd.*, a las págs. 753-756.
[79] *Íd.*, a la pág. 772.
[80] *Íd.*
[81] *Íd.*, a la pág. 775.
[82] *Íd.*, a las págs. 773, 776-777 y 779-780.
[83] *Íd.*, a las págs. 775 y 779
[84] *Íd.*, a la pág. 783.
[85] *Íd.*, a la pág. 784.

Franchesca Esquilín López en el residencial Puerto Real.[86] Durante la entrevista, el señor Juan Cruz Torres le informó que varios individuos armados, incluyendo el acusado, se montaron en una guagua Hyundai Tucson color negro con biombos y que se fueron hacia el residencial Puerto Real.[87] Allí, el señor Juan Cruz Torres le indica que se bajaron todos y comenzaron a disparar en todas direcciones y hacia todas las personas y, que luego, se marcharon hacia Villa Polilla para dejar el vehículo.[88] En Villa Polilla, le informa al agente que llegó el señor Carlos Serrano Vega en su vehículo y procedieron a colocar las armas en el baúl.[89] Durante el interrogatorio, el agente continuamente señalaba que corroboraba la información provista por el señor Juan Cruz.[90]

De igual forma, relató que también entrevistó al Sr. Carlos Alexis Serrano Vega.[91] Esbozó que, el señor Carlos Serrano Vega le narró que proveyó las armas que se utilizaron el 6 de febrero de 2020, las cuales guardaba en la residencia de su madre en el barrio Sardinera, Fajardo.[92] Además, añadió que vio a varios individuos montarse en una Hyundai Tucson, entre ellos, el señor Rodríguez Luna.[93] Después de ello, el señor Carlos Serrano Vega le informa al agente que fue contactado por uno de los individuos para que recolectara las armas utilizadas.[94] A tales efectos, el Agente Velázquez Paz solicitó una orden de allanamiento hacia la casa de la madre del señor Carlos Serrano Vega en el barrio Sardinera, Fajardo.[95] Allí, ocupó un rifle marca *Varska*.[96] Declaró que, después de entrevistar a la Sra. Itzel Rodríguez Caraballo, se dirigió a Veve Calzada para buscar las otras armas.[97] En el lugar, ocupó dos bultos, uno de ellos que contenía un sinnúmero de magacines, balas y un rifle, *Smith & Wesson* y en el otro, cápsulas de *crack*.[98] Relató que había siete (7) cargadores vacíos dentro de esos bultos, uno (1) siendo de rifle y los otros seis (6) peines de 9 milímetros.[99] Sostuvo que, entregó el mencionado rifle al Instituto de Ciencias Forenses para que fuera analizado con los cincuenta y nueve (59) casquillos de rifle que fueron levantados en la escena del 6 febrero de 2020.[100] Dicho esto, relató que el análisis demostró que el rifle fue utilizado en la escena.[101]

Durante el contrainterrogatorio, afirmó que el señor Juan Cruz Torres en ningún momento mencionó que el señor Carlos Serrano Vega hubiera estado con ellos antes de que partieran hacia Puerto Real.[102] De igual manera, expuso que el señor Carlos Serrano Vega en

---

[86] *Íd.*, a la pág. 790.
[87] *Íd.*, a las págs. 790-792.
[88] *Íd.*, a las págs. 792 y 794.
[89] *Íd.*, a la pág. 795.
[90] *Íd.*, a las págs. 787, 789 y 791-795.
[91] *Véase,* TPO del 10 de agosto de 2023, a la pág. 799.
[92] *Íd.*, a la pág. 802.
[93] *Íd.*, a las págs. 802-803
[94] *Íd.*, a las págs. 803-804.
[95] *Íd.*, a la pág. 805.
[96] *Íd.*, a la pág. 807.
[97] *Íd.*, a la pág. 808.
[98] *Íd.*, a la pág. 809.
[99] *Íd.*, a la pág. 814.
[100] *Íd.*, a las págs. 814-816.
[101] *Íd.*, a las págs. 816-817.
[102] *Íd.*, a la pág. 827.

su declaración jurada nunca mencionó al señor Rodríguez Luna.[103] Por otra parte, relató que no se encontró ADN que relacionara al acusado ni tampoco la arma que utilizó.[104]

El Agente de la Policía, el Sr. Luis Alejandro Velázquez, declaró que como parte de la investigación entrevistó a la Sra. Nuria Cruz González, hermana del Sr. Juan Cruz Torres, el 6 de marzo de 2020, la cual conservó en una libreta de anotaciones.[105] Referida libreta fue admitida como Exhibit 2 por parte de la defensa.[106] Según el documento, la señora Nuria Cruz González le informa que el 6 de febrero de 2020 y el día siguiente, el señor Juan Cruz Torres demostraba señales de estar asustado y nervioso.[107] Así las cosas, cuando se lo llevaron arrestado, dos o tres días después, le indicó a su hermana que le iban a dar noventa (90) años por una muerte y que iba acusar "a los muchachos porque [le] dieron la espalda".[108]

Durante el contrainterrogatorio, se señaló que los cargos en contra del acusado fueron radicados el 27 de febrero y que la entrevista de la señora Nuria Cruz se realizó después que el señor Juan Cruz Torres fuera arrestado.[109] De igual forma, que no se corroboró la manifestación de la señora Nuria Cruz González de que la intención de su hermano era acusar a los otros muchachos porque le dieron la espalda.[110]

Aquilatados los testimonios; así como la prueba presentada, el jurado rindió un veredicto de culpabilidad en todos los delitos imputados. El TPI atendió la solicitud de Absolución Perentoria y absolvió al acusado en cuanto a doce (12) cargos por insuficiencia en la prueba para sostener una convicción.[111] Por otro lado, aceptó el veredicto de culpabilidad por entender que fue conforme a derecho y sostenido en la prueba en los casos NSCR202100535 por el Artículo 93 D; NSCR202100538 por el Artículo 6.05 y el NSCR202100544 por el Artículo 6.14, ambos por la Ley de Armas de 2020. El 24 de octubre de 2023 se dictó la *Sentencia* imponiendo las siguientes penas, a cumplirse concurrentes entre sí:

Artículo 93 (D)- 99 años de prisión
Artículo 6.05 – 10 años de prisión aplicando la duplicidad del Artículo 6.01 son 20 años.

---

[103] *Íd.*, a la pág. 835.
[104] *Íd.*, a la pág. 843.
[105] *Véase*, TPO del 22 de agosto de 2023, a las págs. 865-866.
[106] *Íd.*, a la pág. 867.
[107] *Íd.*, a las págs. 867-868.
[108] *Íd.*
[109] *Íd.*, a la pág. 869.
[110] *Íd.*, a la pág. 873.
[111] Los casos fueron los siguientes: NSCR202100536, NSCR202100537, NSCR202100539 a 00543, NSCR202100545 a 00549.

Artículo 6.14 B – 5 años de prisión aplicando la duplicidad del Artículo 6.01 son 10 años.

Inconforme, el 9 de noviembre de 2023, el apelante acude ante este foro intermedio imputándole al TPI la comisión de los siguientes errores:

PRIMER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECRETAR NO HA LUGAR UNA SOLICITUD PARA LA DESESTIMACIÓN, DE TODOS LOS CARGOS PRESENTADOS, AL AMPARO DE LA REGLA 64 N4 DE PROCEDIMIENTO CRIMINAL PRESENTADA POR EL ACUSADO. LO ANTERIOR A PESAR DE HABER TRANSCURRIDO MÁS DE 180 DÍAS DESDE LA PRESENTACIÓN DE LA ACUSACIÓN HASTA EL MOMENTO DE LA DENEGATORIA A DESESTIMAR LOS CARGOS PRESENTADOS POR EL MINISTERIO PÚBLICO.

SEGUNDO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ORDENAR UNILATERALMENTE (SIN SOLICITUD PRESENTADA A ESOS EFECTOS) LA SEPARACIÓN DE LA CAUSA DEL SR. ALEXANDER RODRÍGUEZ LUNA. ES IMPORTANTE DESTACAR QUE NO FUE EXPUESTA JUSTIFICACIÓN NI FUNDAMENTO RAZONABLE PARA LA SEPARACIÓN DE SU CAUSA. LO ANTERIOR VIOLENTÓ EL DEBIDO PROCESO LEGAL DEL SR. ALEXANDER RODRÍGUEZ LUNA.

TERCER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ADMITIR EL EXHIBIT NÚMERO VEINTIDÓS (22) DEL MINISTERIO PÚBLICO, RIFLE MARCA SMITH & WESSON, MODELO M&P-15, CALIBRE 5.56 NATO, NÚMERO DE SERIE ST44931, COLOR NEGRO, CACHAS PASTA NEGRO. COMO REFLEJARA LA PRUEBA, DICHA ARMA FUE ADMITIDA CONDICIONAL A LA FUTURA PRESENTACIÓN DE EVIDENCIA DE CADENA DE CUSTODIA Y PERTINENCIA. POSTERIORMENTE, DURANTE EL JUICIO, NO FUE PRESENTADA EVIDENCIA SOBRE LA PERTINENCIA DE LA PIEZA DE EVIDENCIA MENCIONADA. ADEMÁS, QUEDÓ ESTABLECIDA LA AUSENCIA DE CADENA DE CUSTODIA Y LA ILEGALIDAD DE SU OCUPACIÓN.

CUARTO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EXPONER LAS IDENTIFICACIONES 7 Y 9 DEL MINISTERIO PÚBLICO, PISTOLA MODELO AR-15 TYPE, CALIBRE 5.53 NATO, NO TIENE NÚMERO DE SERIE, COLOR NEGRO, CACHAS PASTA NEGRO. COMO REFLEJARA LA TRANSCRIPCIÓN DEL JUICIO, DICHA PIEZA DE EVIDENCIA FUE EXCLUIDA POR EL TRIBUNAL POR NO SATISFACER CRITERIOS DE CADENA DE CUSTODIA Y PERTINENCIA. A PESAR DE LO ANTERIOR, EL JURADO FUE EXPUESTO A DICHA EVIDENCIA. DICHA EXPOSICIÓN CRE[Ó] UNA IMPRESIÓN INSUBSANABLE EN LAS MENTES Y CONCIENCIAS DE LOS JURADOS, IMPOSIBILITANDO UN VEREDICTO JUSTO E IMPARCIAL BASADO EN PRUEBA ADMISIBLE.

QUINTO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EXPONER AL JURADO A LOS EXHIBITS NO ADMITIDOS DEL MINISTERIO PÚBLICO 15, 15A, 16, 16A, 17 Y 17A. DICHA EVIDENCIA REFLEJÓ GRABACIONES DE VIDEOS DENOMINADOS POR EL MINISTERIO PÚBLICO COMO VIDEO DE TRIMMER, VIDEO DE AAA Y VIDEO PUERTO REAL. COMO REFLEJARA LA TRANSCRIPCIÓN DEL JUICIO, DICHA PIEZAS DE EVIDENCIA FUERON EXCLUIDAS POR EL TRIBUNAL POR NO SATISFACER CRITERIOS DE CADENA DE CUSTODIA Y PERTINENCIA. A PESAR DE LO ANTERIOR, EL JURADO FUE EXPUESTO A DICHA EVIDENCIA. DICHA EXPOSICIÓN CREÓ UNA IMPRESIÓN INSUBSANABLE EN LAS MENTES Y CONCIENCIAS DE LOS JURADOS, IMPOSIBILITANDO UN VEREDICTO JUSTO E IMPARCIAL BASADO EN PRUEBA ADMISIBLE.

SEXTO ERROR: ERRÓ ESTE HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO ANULAR EL JUICIO CELEBRADO EN CONTRA DEL SR. ALEXANDER RODRÍGUEZ LUNA. LO ANTERIOR TODA VEZ QUE EL MINISTERIO PÚBLICO MIENTRAS RENDÍA SU INFORME FINAL AL JURADO, PIDIÓ AL JURADO QUE, AL RENDIR SU VEREDICTO, CONSIDERASE QUE EL ACUSADO HA GUARDADO SILENCIO SOBRE LOS ALEGADOS HECHOS. DICHA EXPRESIÓN POR PARTE DEL MINISTERIO PÚBLICO CREÓ UNA IMPRESIÓN INSUBSANABLE EN LAS MENTES Y CONCIENCIAS DE LOS JURADOS, IMPOSIBILITANDO UN VEREDICTO JUSTO E IMPARCIAL BASADO EN PRUEBA ADMISIBLE, GUARDANDO LOS DERECHOS CONSTITUCIONALES DEL ACUSADO.

SÉPTIMO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO HA LUGAR LA SOLICITUD DE ABSOLUCIÓN PERENTORIA PRESENTADA POR LA DEFENSA. LA TRANSCRIPCIÓN DEL JUICIO REFLEJARÁ INSUFICIENCIA DE PRUEBA PARA SOSTENER UNA CONVICCIÓN POR LOS DELITOS DE ASESINATO EN PRIMER GRADO (ARTÍCULO 93 D DEL CÓDIGO PENAL); PORTACIÓN, TRANSPORTACIÓN O USO DE ARMAS DE FUEGO SIN LICENCIA (ARTÍCULO 6.04 DE LA LEY DE ARMAS) Y; DISPARAR O APUNTAR ARMA DE FUEGO (ARTÍCULO 6.14 DE LEY DE ARMAS).

OCTAVO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL INSTRUIR AL JURADO QUE ERA SU DEBER Y OBLIGACIÓN RENDIR UN VEREDICTO DE UNANIMIDAD. LO ANTERIOR, SIN INFORMAR AL JURADO SOBRE LA POSIBILIDAD DE QUE NO LOGREN CONSENSO EN CUANTO A LA CULPABILIDAD DEL ACUSADO Y LA CONSECUENCIA QUE ACARREARÍA LA FALTA DE UNANIMIDAD EN EL VEREDICTO. INSTRUIR AL JURADO QUE ES SU DEBER Y OBLIGACIÓN RENDIR UN VEREDICTO POR UNANIMIDAD ES INCOMPATIBLE CON RENDIR UN VEREDICTO BASADO EN LA APRECIACIÓN DE LA PRUEBA Y EL CRITERIO INDIVIDUAL DE CADA JURADO.

Por consiguiente, el 13 de noviembre de 2023, el señor

Rodríguez Luna presentó una *Moción Informando Trámite para la*

*Reproducción de la Prueba Oral* donde nos solicitó que ordenáramos al TPI que transcribiera, de oficio, la prueba oral presentada durante el juicio en su fondo. Atendido el recurso y la moción solicitando la reproducción de la prueba oral, el 15 de noviembre de 2023, emitimos una *Resolución* ordenándole al TPI regrabar la prueba oral, libre de costos, particularmente de las siguientes fechas: 21 de enero de 2022; 1 de marzo de 2022; 11, 24, 26 y 28 de mayo de 2023; 2, 3, 7, 8, 9, 10, 23 y 28 de agosto de 2023 y remitirlas a la Secretaria del Tribunal de Apelaciones. De igual forma, ordenamos que se elevaran los autos originales y la prueba documental admitida.

Tras varios incidentes procesales, el 8 de mayo de 2025, el apelante presentó una *Moción Reiterando Moción Informativa sobre Transcripción de la Prueba Oral y Solicitud de Corrección.* En esta, alegó que la Transcripción de la Prueba Oral (TPO) era fiel y exacta a su contenido. No obstante, señaló que la TPO no recogía las argumentaciones iniciales y finales que las partes realizaron al jurado. Resaltó que dichas argumentaciones eran indispensables para atender uno de los errores señalados en el recurso, por lo que, solicitó la transcripción de estas. Atendida la moción, el 14 de mayo de 2025, emitimos una *Resolución* donde declaramos *Ha Lugar* a la transcripción de las argumentaciones.

Así las cosas, el 20 de agosto de 2025, emitimos una *Resolución* en la cual, notificadas las transcripciones de las argumentaciones según solicitadas por la parte apelante, le concedimos a las partes el término de diez (10) días para estipular su corrección.

El 2 de septiembre de 2025, las partes presentaron una *Moción Conjunta en Cumplimiento de Orden.* Allí, informaron que no tenían enmiendas que sugerir a la transcripción de las argumentaciones, por lo que, no tenían reparos con la estipulación de la misma. A esos efectos, el 4 de septiembre de 2025, emitimos

una *Resolución* donde dimos por estipuladas la TPO y la transcripción de las argumentaciones. De igual forma, le concedimos a la parte apelante hasta el 24 de septiembre de 2025, para presentar, de entenderlo necesario, un alegato suplementario.

El 24 de septiembre de 2025, el apelante presentó su alegato suplementario. Así, el 25 de septiembre de 2025, emitimos una *Resolución* concediéndole a la parte apelada hasta el 24 de octubre de 2025 para presentar su alegato.

El 23 de octubre de 2025, la Oficina del Procurador General presentó su alegato en oposición por lo que, decretamos perfeccionado el recurso.

Analizados las comparecencias de las partes, el expediente apelativo y la TPO; así como estudiado el derecho aplicable, procedemos a resolver.

**II.**

**Derecho a Juicio Rápido**

El derecho de todo acusado a un juicio rápido emana del Artículo II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico. Artículo II, Sec. 11, Const. ELA, LPRA, Tomo 1. Esto promueve un interés dual, toda vez que se protege al acusado contra una detención opresiva y reduce la posibilidad de que su defensa se afecte. *Pueblo v. Rivera Santiago*, 176 DPR 559, 570 (2009). A su vez, responde a "las exigencias sociales de enjuiciar con prontitud a quienes son acusados de violar sus leyes". *Íd.*

La Regla 64(n) de las de Procedimiento Criminal, atiende estatutariamente el derecho a juicio rápido. *Pueblo v. Cartagena Fuentes*, 152 DPR 243, 249 (2000). En lo pertinente, el inciso (n)(4) de la aludida Regla dispone que uno de los fundamentos para solicitar la desestimación de una acusación es "[q]ue el acusado no fue sometido a juicio dentro de los ciento veinte (120) días siguientes a la presentación de la acusación o denuncia". Regla 64(n)(4) de

Procedimiento Criminal, 34 LPRA Ap. II, R. 64. No obstante, la jurisprudencia ha establecido que al evaluar esta solicitud no puede considerarse como un ejercicio de "tiesa aritmética" en el que la inobservancia del término, por sí sola, constituye una violación al derecho a juicio rápido, ni tampoco conlleva la desestimación de la denuncia o la acusación. *Pueblo v. Guzmán*, 161 DPR 137, 154 (2004). Por ello, los términos de la Regla 64 de Procedimiento Criminal, *supra*, "no son fatales y pueden extenderse bien sea por justa causa, por demora atribuible al acusado o si éste consiente a ella". *Pueblo v. Garcia Vega*, 186 DPR 592, 610 (2012).

De igual manera, nuestra jurisprudencia ha reiterado que, para evaluar las reclamaciones de violaciones al derecho a juicio rápido, existen cuatro criterios a examinarse en conjunto, estos son: (1) la duración de la tardanza; (2) las razones para la dilación; (3) si el acusado invocó oportunamente el derecho a juicio rápido, y (4) el perjuicio resultante de la tardanza. *Pueblo v. Guzman*, supra, a las págs.154-155. Además, se ha resuelto que ninguno de estos factores es determinante y están sujetos a un balance. *Íd.*, a la pág. 155. Ahora bien, una vez el acusado reclama oportunamente una violación a los términos fijados por la Regla 64(n), *supra*, el peso en demostrar la causa justificada para la demora recae sobre el Ministerio Público. *Pueblo v. Valdés*, 155 DPR 781, 791 (2001). Así, estos elementos de justa causa se deben evaluar dentro los parámetros de razonabilidad. *Pueblo v. García Vega*, supra, a la pág. 612.

El imputado, en cambio, es quien tiene que establecer el perjuicio a causa de la dilación. *Pueblo v. Rivera Santiago*, supra, a las págs. 576-577. Con respecto al criterio de perjuicio, se ha determinado que el imputado no tiene que demostrar un estado de indefensión, sino el perjuicio sufrido. *Íd.* Sobre el descargo de este deber, nuestro Tribunal Supremo en *Pueblo v. Valdés*, supra, a la

pág. 792, citó las expresiones del Prof. Ernesto L. Chiesa en su obra

*Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia,

Ed. Forum, 1992, Vol. II, pág. 153, las cuales expresaban que:

> …corresponde al acusado establecer el perjuicio sufrido con la dilación, **obligación que no se descarga con generalidades**. Esto es distinto a las razones o justa causa para la dilación, donde es el ministerio fiscal o el gobierno quien tiene que persuadir al Tribunal, **al menos cuando la dilación o suspensión es atribuible a conducta del gobierno**.

> El Tribunal Supremo de Puerto Rico ha expresado que el perjuicio sufrido por el acusado con la dilación tiene que ser específico: "No puede ser abstracto ni apelar a un simple cómputo de rigor matemático. **Tiene que ser real y sustancial**. [Énfasis nuestro].

**El Código Penal y la Ley de Armas de Puerto Rico**

En lo aquí pertinente, nuestro Código Penal tipifica los delitos

imputados en el caso de epígrafe de la siguiente manera.

El Artículo 93 inciso (d), 33 LPRA sec. 5142, dispone que

constituye asesinato en primer grado "[t]odo asesinato causado al

disparar un arma de fuego desde un vehículo de motor, o en un

lugar público o abierto al público, ya sea a un punto determinado o

indeterminado."

Por otro lado, la Ley núm. 168-2019, según enmendada,

conocida como la *Ley de Armas de Puerto Rico de 2020* dispone en

el Artículo 6.05, 25 LPRA sec. 466d, intitulado *Portación,*

*Transportación o Uso de Armas de Fuego sin Licencia*, como sigue:

> Toda persona que porte, transporte o use cualquier arma de fuego, sin tener una licencia de armas vigente, salvo lo dispuesto para los campos de tiro o lugares donde se practica la caza, incurrirá en delito grave y convicto que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a, o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión reconocida en esta jurisdicción. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
> …
> …
> Cuando el arma sea una neumática, pistola de o artefacto de descargas eléctricas, de juguete o cualquier imitación de arma y ésta se portare o transportare con la intención de cometer delito o se usare para cometer

> delito, la pena será de reclusión por un término fijo de cinco (5) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.
> …
> …

En cuanto al Artículo 6.14 inciso (b), supra, 25 LPRA sec. 466m, intitulado *Disparar o Apuntar Armas de Fuego* establece que:

> Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:
> (a) …
> (b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.
> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.

Por último, el Artículo 6.01 del referido cuerpo legal, 25 LPRA sec. 466, dispone que toda persona que resulte convicta por algunas de sus disposiciones será sancionada con el doble de la pena provista en estatuto aplicable.

**El concepto de duda razonable**

La Constitución de Puerto Rico garantiza el derecho de todo acusado en procesos criminales a gozar de la presunción de inocencia. Artículo II, Sec. 11, Const. ELA, LPRA, Tomo I. Para poder rebatir esa presunción, se exige que el Estado presente prueba, más allá de duda razonable, sobre todos los elementos del delito y su conexión con el acusado. *Pueblo v. García Colón*, 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009); *Pueblo v. Irizarry,* 156 DPR 780, 786 (2002); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

Cónsono con lo anterior, la Regla 110 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone, en lo pertinente, que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras que no se probare lo contrario, y en caso de existir duda razonable

acerca de su culpabilidad, se le absolverá...". Para cumplir con ese rigor probatorio, nuestro sistema de justicia criminal requiere que la prueba que presente el Ministerio Público sea suficiente en derecho, lo que significa que la evidencia presentada tiene que producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995); *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974).

Lo anterior no implica que la culpabilidad del acusado tenga que establecerse con certeza matemática. La duda razonable tampoco se refiere a especulaciones del juzgador, sino que es una duda fundada que surge como producto del raciocinio de todos los elementos de juicio presentes en el caso. *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985); *Pueblo v. Cruz Granados*, 116 DPR 3, 21-22 (1984). Además, para justificar la absolución de un acusado, la duda razonable debe surgir de manera serena, justa e imparcial, luego de que el juzgador considere la totalidad de la evidencia del caso o de la falta de suficiente prueba que apoye la acusación. *Pueblo v. Irizarry*, supra, a la pág. 788. En conclusión, la duda razonable es la insatisfacción de la conciencia del juzgador con la prueba presentada. *Pueblo v. Cabán Torres*, supra, a la pág. 652.

**Apreciación de la prueba y estándar de revisión apelativa**

Por último, cuando estamos ante una revisión en la esfera criminal, nuestro Tribunal Supremo ha establecido que los foros apelativos no debemos olvidar que el juzgador de los hechos en primera instancia está en especial ventaja al momento de aquilatar la prueba y los testimonios presentados. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 477-478 (2013); *Pueblo v. Rosario Reyes*, supra, a las págs. 598-599 (1995). Por tanto, la apreciación hecha a ese nivel

merece gran respeto. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011).

El Tribunal Supremo en *Pueblo v. Irizarry*, supra, a las págs. 788-789, reiterado en *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014) expresó:

> [E]n el ejercicio de tan delicada función revisora, no podemos abstraernos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones[sic] criminales, siempre nos hemos regido por la norma a los efectos de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador [...].

Ahora bien, esta doctrina de deferencia judicial no es absoluta y cede ante las posibles injusticias que pueda acarrear las determinaciones de hechos que no estén sustentadas por la prueba desfilada ante el foro primario. Los tribunales apelativos solo intervenimos con la apreciación hecha cuando se demuestre satisfactoriamente la existencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Maisonave*, 129 DPR 49, 63 (1991). Es ante la presencia de alguno de estos elementos, o cuando la apreciación de la prueba no concuerde con la realidad fáctica, o sea inherentemente increíble o claramente imposible, es que intervendremos con la apreciación formada. *Pueblo v. Irizarry*, supra, a la pág. 789. Además, cuando la evidencia directa de un testigo le merece entero crédito al juzgador de hechos, ello constituye prueba suficiente de cualquier hecho. *Rivera Menéndez v. Action Services*, 185 DPR 431, 444 (2012).

**III.**

De entrada, destacamos que el apelante le imputó al foro primario haber cometido ocho (8) señalamientos de error. Así, dado que resultaba indispensable para su recurso, nos solicitó que ordenáramos al TPI que transcribiera, de oficio, la prueba oral presentada durante el juicio en su fondo, lo cual se realizó. Pese a

ello, nos indicó que la TPO no recogía las argumentaciones iniciales y finales que eran necesarias para atender uno de los errores señalados. Por lo cual, este foro revisor también ordenó la transcripción de estas. No obstante, tras recibir las transcripciones del juicio, el apelante retiró el segundo, tercer, cuarto, quinto, sexto y el octavo señalamiento de error.[112]

Respecto los señalamientos restantes, en el primer error el apelante esboza que erró el TPI al declarar *No Ha Lugar* a la desestimación de los cargos por violación al juicio rápido como indica la Regla 64(n)(4). En cuanto a este, apuntalamos que el derecho a juicio rápido no es una protección absoluta para el acusado, ni opera en un vacío. El mismo se enmarca en el debido proceso de ley y la normativa que gobierna los procedimientos criminales. *Pueblo v. Custodio Colón*, 192 DPR 567, 581 (2015). Por lo que, la inobservancia del término, por sí solo, no constituye una violación que conlleve la desestimación de la denuncia o la acusación. *Pueblo v. Rivera Santiago*, supra, a la pág. 571. Es decir, el derecho a juicio rápido no es incompatible con cierta demora del procedimiento criminal, pues, "hay elementos de justa causa para la demora que reconcilian el derecho a juicio rápido con las circunstancias reales de cada caso y los derechos del acusado han de atemperarse a la administración práctica de justicia". *Pueblo v. Custodio Colón*, supra, a la pág. 581; *Pueblo v. García Vega*, supra, a las págs. 611-612.

---

[112] El 8 de mayo de 2025, el apelante presentó un escrito intitulado *Moción Reiterando Moción Informativa sobre Transcripción de la Prueba Oral y Solicitud de Corrección.* Mediante esta, argumentó que la transcripción de las argumentaciones iniciales y finales eran indispensables para discutir el señalamiento de error núm. 6. Eventualmente, en su alegato suplementario, reconoció que luego de leídas las transcripciones -sobre las vistas a las que él tenía acceso como audio y de las que participó en representación legal-, interesaba retirar seis (6) de los ocho (8) errores señalados, incluyendo, el Sexto Señalamiento de Error, por el que solicitó reprodujera la prueba oral adicional de las argumentaciones finales e iniciales. Ello, en dilación del proceso de apelación y sufragado con dinero del erario. Advertimos al abogado que, dentro de sus deberes de diligencia y competencia, debió haber previsto que no eran necesarias las transcripciones solicitadas evitando dilaciones al proceso judicial y la erogación del erario.

Por tanto, al momento de evaluar una reclamación por violación al derecho a juicio rápido se debe tomar en consideración cuatro criterios en conjuntos, a saber: (1) la duración de la tardanza; (2) las razones para la dilación; (3) si el acusado invocó oportunamente el derecho a juicio rápido, y (4) el perjuicio resultante de la tardanza. *Pueblo v. Guzmán*, supra, a las págs.154-155. Asimismo, es norma reiterada que ninguno de estos factores es determinante por sí mismo y están sujetos a un balance. *Íd.*, a la pág. 155.

Corolario de lo anterior, surge de la *Minuta* de la *Vista de Lectura de Acusación* celebrada el 1 de noviembre de 2021 en contra del señor Rodríguez Luna y los otros coacusados, **que estos informaron que renunciaban a su reclamo de juicio rápido y que no había problema de término, toda vez que las partes no tenían fechas disponibles antes de enero de 2022**.[113] A pesar de ello, el apelante presentó una moción de desestimación al amparo de la Regla 64(n)(4).[114] Así, arguyó que aunque el acusado estaba excarcelado, el dispositivo electrónico le había generado perjuicio toda vez que tenía su libertad restringida y que se ha visto en la necesidad de cambiar de hogar constantemente.[115]

Ahora bien, reiteramos que los términos de la Regla 64 de Procedimiento Criminal, *supra*, "no son fatales y pueden extenderse bien sea por justa causa, por demora atribuible al acusado o si éste consiente a ella". *Pueblo v. Garcia Vega*, supra, a la pág. 610. Dicho esto, consta en los autos que no tan solo el apelante renunció a su reclamo de juicio rápido, sino que continuó solicitando descubrimiento de prueba hasta el 12 de abril de 2022, fecha la cual habitaba fuera de los ciento y veinte (120) días establecidos por la

---

[113] *Véase*, Apéndice del Recurso, Anejo III, a las págs. 19-20
[114] *Íd.*, anejo XII, a las págs. 58-59.
[115] *Véase*, TPO del 11 de mayo de 2022, a las págs. 72-73.

Regla 64 y que no fue hasta el 2 de mayo de 2022, que presentó su moción de desestimación al amparo del inciso (n)(4) de referida norma.[116] A su vez, es preciso señalar que el alegado perjuicio que contempla una violación de juicio rápido no requiere demostrar un estado de indefensión, pero tampoco se cumple con meras generalidades. Por lo cual, destacamos que la libertad restringida causada por el dispositivo electrónico no satisface el elemento de perjuicio según enunciados por la jurisprudencia. A tales efectos, resolvemos que el TPI no incidió al declarar *No Ha Lugar* a la moción de desestimación, al amparo de la Regla 64(n)(4) luego de sopesar los argumentos esbozados por las partes.

En cuanto el séptimo error, el apelante cuestionó la apreciación de la prueba realizada por el foro de primera instancia. Este entiende que la misma no fue suficiente para demostrar su culpabilidad más allá de toda duda razonable y por lo cual, se debió declarar ha lugar a la absolución perentoria.

Para poder rebatir la presunción de inocencia, nuestro ordenamiento exige que el Estado presente prueba, más allá de duda razonable, sobre todos los elementos del delito y su conexión con el acusado. *Pueblo v. García Colón,* supra, a la pág. 174; *Pueblo v. Santiago et al.*, supra, a la pág. 142; *Pueblo v. Irizarry,* supra, a la pág. 786; *Pueblo v. Acevedo Estrada*, supra, a la pág. 99. Ahora bien, esto no implica que la culpabilidad del acusado se establezca con certeza matemática, sino que la prueba presentada sea suficiente para producir "aquella certeza moral que convence, dirige la inteligencia y satisface la razón". *Pueblo v. Bigio Pastrana,* supra, a la pág. 761; *Pueblo v. Cruz Granados*, supra, a las págs. 21-22. Dicho esto, la duda razonable no es una especulativa o imaginaria, más bien, es aquella fundada, producto del "raciocinio de todos los

---

[116] *Véase*, TPO del 1 de marzo de 2022, a las págs. 45-55 y Apéndice del Recurso, Anejo XI-XII, a las págs. 56-59

elementos de juicio envueltos en el caso". *Íd.* De igual manera, puntualizamos que cualquier evidencia directa de un testigo que merezca entero crédito al juzgador es suficiente para probar cualquier hecho. *Rivera Menéndez v. Action Services*, supra, a la pág. 444.

Así, tras el análisis íntegro y minucioso de la totalidad del expediente del caso que nos ocupa, que incluye la TPO, juzgamos que el Ministerio Público evidenció más allá de duda razonable los elementos de los delitos imputados en contra del señor Rodríguez Luna. En primer lugar, del testimonio del señor Cruz Torres surge que el apelante, entre otros, en concierto y común acuerdo, coordinaron tirotear el Residencial Puerto Real.[117] A tales efectos, el señor Cruz Torres declaró que el señor Rodríguez Luna y él recibieron armas del señor Serrano Vega, lo cual confirma el testimonio de este último.[118]

Después de estar armados, el señor Cruz Torres relató que se montaron en una guagua Hyundai Tucson en ruta hacia el Residencial Puerto Real.[119] Allí, testificó que se bajaron del vehículo y todos procedieron a disparar hacia los Edificios 1, 2 y 7.[120] Como resultado, proyectiles alcanzaron a la señora Esquilín López, la cual falleció ante las heridas causadas. Hecho establecido conforme al testimonio de la Dra. Rodríguez Castillo.[121] Luego del acto, el señor Serrano Vega relató que acudió a Villa Polilla donde se encontraban los acusados, incluyendo al apelante, y estos procedieron a depositar las armas en el baúl de su vehículo.[122]

En virtud de lo anterior, sin lugar a dudas, colegimos que el Ministerio Público cumplió con establecer los elementos según

---

[117] *Véase,* TPO del 7 de agosto de 2023, a la pág. 623.
[118] *Íd.*, a las págs. 622 y 624; *Véase,* TPO del 8 de agosto de 2023, a la págs. 689-690 y 692.
[119] *Véase,* TPO del 7 de agosto de 2023, a las págs. 624-626.
[120] *Íd.*, a las págs. 629-632.
[121] *Véase,* TPO del 26 de mayo de 2023, a las págs. 363-364.
[122] *Véase,* TPO del 8 de agosto de 2023, a la págs. 695-696.

tipificados en el Artículo 93(d) del Código Penal de 2012 y los Artículos 6.05 y 6.14(b) de la Ley de Armas, así como la conexión con el apelante.

En consecuencia, determinamos que no erró el juzgador tras la denegación de la solicitud de absolución perentoria.

Por último, subrayamos que no procede que intervengamos con la apreciación de la prueba oral del juzgador de hechos y le concedemos deferencia por estar en mejor posición para dirimir la credibilidad de los testigos y adjudicar la evidencia presentada. Tampoco se nos puso en condición para determinar lo contrario, ya que no se refutaron los testimonios vertidos en el juicio antes detallados. En este sentido, el apelante falló en demostrar que el foro de primera instancia haya actuado con pasión, prejuicio, parcialidad o error manifiesto. Asimismo, la determinación estuvo fundamentada en la prueba desfilada en el juicio.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones